# EXHIBIT 1

1 | **QUADE & ASSOCIATES, a PLC**
MICHAEL W. QUADE, ESQ. [S.B. #171930]
2 | CHERYL L. GUSTAFSON, ESQ.   [S.B. # 234490]
3377 Carmel Mountain Road, Suite 250
3 | San Diego, California 92121
Tel: (858) 642-1700
4 | Fax: (858) 642-1778

5 | Attorneys for Christian Naylor and Christian Naylor dba Naylor Construction

6

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | FOR THE COUNTY OF SAN DIEGO, NORTH COUNTY DIVISION

10

11 | CHRISTIAN NAYLOR, an individual; and
CHRISTIAN NAYLOR dba NAYLOR
12 | CONSTRUCTION,
13 |                Plaintiffs,
14 | v.
15 | NAVIGATORS INSURANCE COMPANY, a
corporation; NAVIGATORS
16 | MANAGEMENT COMPANY, INC., a
corporation; LINCOLN GENERAL
17 | INSURANCE COMPANY, a corporation;
GEMINI INSURANCE COMPANY, a
18 | corporation, W.R. BERKLEY
CORPORATION, a corporation and DOES 1
19 | through 50, inclusive,
20 |                Defendants.

CASE NO. **37-2011-00060024-CU-BC-NC**

I/C JUDGE:
DEPT.:

**COMPLAINT FOR DAMAGES:**

(1) Breach of Contract

(2) Breach of Covenant of Good Faith and
    Fair Dealing

(3) Injunctive Relief and Restitution
    Pursuant To Business & Professions
    Code § 17200, et Seq.

(4) Declaratory Relief

21

22 |      COMES NOW, PLAINTIFFS CHRISTIAN NAYLOR, an individual, and CHRISTIAN

23 | NAYLOR dba NAYLOR CONSTRUCTION (hereinafter collectively referred to as "Plaintiffs") allege

24 | as follows:

25 | ///

26 | ///

27 | ///

28 | ///

Q: Christian
Naylor\Pleadings\Complaint.w
pd

## GENERAL ALLEGATIONS

1.     At all material times herein Plaintiff, CHRISTIAN NAYLOR, is an individual residing in the County of San Diego, California.

2.     At all material times herein Plaintiff NAYLOR CONSTRUCTION was a dba for CHRISTIAN NAYLOR, a licensed general contractor, holding license number 810761, residing in the County of San Diego, California.

3.     Plaintiffs are informed and believe and thereon allege that at all material times herein NAVIGATORS MANAGEMENT COMPANY, INC. is and was a New York corporation licensed and doing business in the State of California.

4.     Plaintiffs are informed and believe and thereon allege that at all material times herein NAVIGATORS INSURANCE COMPANY is and was a New York corporation licensed and doing business in the State of California.

5.     NAVIGATORS MANAGEMENT COMPANY, INC. and NAVIGATORS INSURANCE COMPANY are collectively referred to herein as "Navigators."

6.     Plaintiffs are informed and believe and thereon allege that at all material times herein LINCOLN GENERAL INSURANCE COMPANY ("Lincoln General") is and was a Pennsylvania corporation licensed and doing business in the State of California.

7.     Plaintiffs are informed and believe and thereon allege that at all material times herein GEMINI INSURANCE COMPANY is and was a Delaware corporation doing business in the State of California.

8.     Plaintiffs are informed and believe and thereon allege that at all material times herein W.R. BERKLEY CORPORATION is and was a Delaware corporation doing business in the State of California.   Plaintiffs are informed and believe and thereon allege that W.R. BERKLEY CORPORATION is the parent corporation of GEMINI INSURANCE COMPANY.

9.     W.R. BERKLEY CORPORATION and GEMINI INSURANCE COMPANY are collectively referred to herein as "Gemini Insurance."

///

///

J:\Christian
Naylor\Pleadings\Complaint.w
pd

10.     Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, Defendants herein named, was and still is, legally responsible in some manner for the events and happening herein referred to and proximately cause injuries and damages to Plaintiffs.

11.     Plaintiffs are ignorant of the true names and capacities of defendants sued herein as DOES 1 to 50, inclusive, and therefore sues these defendants by such fictitious names.  Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.  Plaintiffs are informed and believe and thereon allege that each of said fictitiously named defendants is legally responsible in some manner for the occurrences herein alleged; and that the Plaintiffs' injuries and damages as herein alleged were proximately caused by those defendants.  Each reference in this complaint to "Defendant," "Defendants" or a specifically named defendant refers also to all defendants sued under fictitious names.

12.     Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, Defendants were the agents, employers, employees, joint venturers, partners, and/or associates of each other, and at all times mentioned herein were acting within the purpose, course and scope of that agency, employment, joint venture, partnership and/or association with the knowledge, permission and consent of each and all of the other defendants.

## FACTUAL ALLEGATIONS

**Naylor's Work at Subject Property**

13.     Plaintiffs are informed and believe, and thereon allege, that Naylor was hired in and around May 2004 by 1320 Summit Ave., LLC to perform general contracting services related to the construction of three new single-family homes in Cardiff California which bore the addresses, 1320, 1318 and 1316 Summit Ave.  Naylor's contract was dated May 26, 2004 and is attached hereto as **Exhibit "A"**

14.     Plaintiffs are informed and believe, and thereon allege, that Michael Aulert was the principal and developer who established and managed Defendant 1320 Summit Ave., LLC.  Plaintiffs are further informed and believe and thereon allege that at all times relevant herein, Aulert was an authorized agent of 1320 Summit Ave., LLC.  Plaintiffs are informed and believe and thereon allege that Main Street Partners, Inc. was the corporation that managed 1320 Summit Ave., LLC.

1      15.   1320 Summit Ave., LLC; Michael Aulert; Michael Aulert, Inc.; and Main Street

2 Partners, Inc. are collectively referred to herein as the "Summit Developers."

3      16.   Naylor served as the general contractor for the beginning stages of the project. He acted

4 as a general contractor to oversee completion of the foundation, drainage, and commenced a very

5 small portion of the first floor framing. Naylor's work on the subject property was from approximately

6 May 2004 to approximately April 2005.

7      17.   During the course of its work, Naylor selected and the Summit Developers approved

8 subcontractors to perform foundation work and rough plumbing work.

9      18.   Coast Contracting & Development, Inc. acted as the foundation/concrete subcontractor

10 and added Naylor as a Certificate Holder and Additional Insured. See Certificate of Liability attached

11 hereto as **Exhibit "B"** for Policy Number VCGP008343 with Gemini Insurance Company. The policy

12 effective dates were 02/26/04 to 02/26/05.

13      19.   Steele Plumbing acted as the rough plumbing subcontractor and added Naylor as a

14 Certificate Holder and Additional Insured. See Certificate of Liability attached hereto as **Exhibit "C"**

15 for Policy Number 25370282590 with Lincoln General Insurance Company. The policy effective dates

16 were 03/01/04 to 03/01/05.

17      20.   Naylor along with assistance from the subcontractors completed the foundation and

18 drainage work.

19      21.   Plaintiffs are informed and believe, and thereon allege, that the City of Encinitas

20 Building Inspection Division gave final approval to the foundation work.

21      22.   In or around March 2005, Naylor began commencement of framing at 1316 Summit

22 Ave. In or around April 2005, after disagreements arose between Naylor and the Summit Developers

23 with regards to the pricing for framing work and general disagreements regarding the work at the

24 project, Naylor and the Summit Developers mutually agreed to cease their working relationship.

25      23.   Plaintiffs are informed and believe, and thereon allege, that the three homes were

26 ultimately completed in 2006 and sold to various purchasers.

27 ///

28 ///

**The Stein Action**

24.    On or about December 13, 2006, escrow closed on the subject property when Steven R. Stein and Tova Stein ("Steins") purchased the home located at 1316 Summit Ave., from the LLC established by the Summit Developers for the three homes constructed.

25.    Approximately six months after moving in, the Steins suffered significant water and moisture related issues at the subject home, along with other various defective building components.

26.    On or about September 23, 2008, individually and on behalf of their trust, the Steins filed a complaint in the San Diego Superior Court of the State of California entitled Stein v. Aulert et al., bearing the case number 37-2008-00092428-CU-CD-CTL ("Stein Action")  This case was consolidated with a case filed by the Summit Developers against certain subcontractors bearing case number 37-2008-00087938-CU-CD-CTL. Naylor was a named defendant in the Stein Action as "Naylor Construction, Inc., a California corporation". Naylor answered on November 7, 2008 as "Christian Naylor d.b.a. Naylor Construction erroneously sued as Naylor Construction, Inc." A true and correct copy of the operative complaint in the Stein Action (exhibits omitted) is attached as **Exhibit "D"** to this complaint and incorporated herein by reference.

27.    The operative complaint in the Stein Action alleged a negligence cause of action against Naylor.

28.    Various tenders have been made to Defendants Navigators, Lincoln General, and Gemini for the claims alleged against Naylor in the Stein Action.  Despite same, Defendants Navigators, Lincoln General, and Gemini refused to provide any coverage contractually due to Naylor. See summary of tender efforts outlined more fully below.

29.    Based on the denial of coverage, Plaintiffs subsequently retained defense counsel at their own expense in order to defend themselves in the ongoing Stein Action.  Throughout the calendar years 2008-2011, Plaintiffs participated in and engaged in significant and costly discovery and law and motion matters in preparation for the trial in the Stein Action.  Again, all litigation was at Plaintiffs' own expense based on the denial of coverage by Defendants.

30.    Trial in the Stein Action was set for October 28, 2011.  In or around early 2011, Plaintiffs and the Steins engaged in settlement discussions.

Christian
Naylor:Pleadings:Complaint.w
d

1    31.    In or around  August and September 2011, following settlement discussions, Plaintiffs

2  and the Steins, reached a settlement in the Stein Action.  The terms are more fully set forth in the

3  Settlement Agreement attached as **Exhibit "E"** to this complaint.  Generally, the parties agreed to an

4  assignment by Plaintiffs to the Steins of a portion of proceeds of a bad faith action in exchange for a

5  covenant not to execute on a stipulated judgment.

6    32.    Plaintiffs are informed and believe and thereon allege that this was a reasonable

7  settlement or resolution of the Steins' claims against Plaintiffs in light of factors, including but not

8  limited to, Naylor's potential exposure at trial and their financial inability to proceed to trial or meet

9  the Steins' settlement demands.

10    33.    On or about September 9, 2011, following briefing and oral argument, the trial court

11  in the Stein action affirmed the Steins-Naylor settlement by determining it was in good faith pursuant

12  to California *Code of Civil Procedure* § 877.6.

13  **Navigators Insurance**

14    34.    In or around March 2004, Naylor purchased a written Commercial General Liability

15  policy of insurance (Policy No.GS409639). Naylor's Liability Policy had effective dates of coverage

16  of March 6, 2004 through March 6, 2005.  Approximately one year later, Naylor renewed this policy

17  and was provided with Policy No. GS513103.  This renewed policy had effective dates of coverage

18  from March 14, 2005 to March 14, 2006.  The two policies are hereinafter collectively referred to as

19  "Naylor's Liability Policy."   Naylor's Liability Policy is attached hereto as **Exhibit "F"** and

20  incorporated by reference as though fully set forth at length.

21    35.    Plaintiffs are informed and believe and thereon allege that Naylor's Liability Policy was

22  delivered to the Plaintiffs in the State of California and that all premiums for the policy were paid in

23  California. Plaintiffs are informed and believe and thereon allege that Naylor paid a premium totaling

24  $10,632.18 for the 2004-2005 policy and a premium totaling $29,986.86 for the 2005-2006 policy.

25    36.    Plaintiffs are informed and believe and thereon allege that the named insured under

26  Naylor's Liability Policy is "Christian Naylor DBA Naylor Construction."

27    37.    Plaintiffs are informed and believe and thereon allege that Naylor's Liability Policy

28  provides in part:

SECTION I - COVERAGES
COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement
   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which the insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit that may result.

38. After being served with the summons and complaint in the Stein Action, the matter was timely and duly tendered to Navigators. Litigation Specialist, Nancy Barrow of Navigators acknowledged the receipt of the tender of the defense in a letter to Plaintiffs dated February 27, 2008 advising that the investigation was ongoing. Over nine months later, on December 9, 2008, Navigators, via Nancy Barrow, again sent correspondence to Naylor, outlining Defendants' denial of coverage for the Stein Action. It appears that the denial was based solely on review of the Complaint in the Stein Action and information provided by the Summit Developers. Plaintiffs are informed and believe and thereon allege that no other meaningful investigation was performed nor was any investigation later performed following availability of later-acquired litigation discovery. A true and correct copy of the denial letter is attached as **Exhibit "G"** to this complaint and incorporated herein by this reference as though fully set forth at length.

39. On or about September 1, 2010, the Steins re-tendered the Stein Action to Navigators requesting it reconsider its position. The correspondence provided the insurance policy, information regarding the status of lawsuit, Plaintiffs' potential exposure on the claim, the location of the document depository and provided the Cost to Repair and Defect List. Said correspondence was sent via certified mail and facsimile. Proof of receipt by Navigators was obtained.

40. No response was received, and, thus, no defense or indemnity policy benefits were received by Plaintiffs. Navigators failed to re-examine their previous denial and consider any later acquired information obtained in the litigation since its December 2008 correspondence.

41. On or about August 10, 2011, Navigators was put on notice via certified mail, return receipt and facsimile of the pending settlement between the Steins and Plaintiffs. The transmittal included a copy of Plaintiffs' motion for good faith settlement determination that outlined the

1   assignment of rights to a bad faith action. Proof of receipt by Navigators was obtained. See letter with

2   confirmation of receipt attached hereto as **Exhibit "H"** (enclosures omitted).

3        42.    No response was received to this August 10, 2011 correspondence.

4   **Lincoln General Insurance**

5        43.    Plaintiffs are informed and believe and thereon allege that in or around March 2004,

6   Steele Plumbing purchased a written Commercial General Liability policy of insurance (Policy No.

7   25370282590) from Lincoln General. Steele Plumbing's policy had effective dates of coverage of

8   March 1, 2004 through March 1, 2005. A second policy was also purchased that had effective dates

9   of coverage of March 1, 2005 to March 1, 2006 (Policy No. 6320024398.) The two policies are

10  hereinafter collectively referred to as "the Lincoln General Liability Policy." It is unknown at this time

11  if Plaintiffs were additional insureds on the second '05-'06 policy.

12        44.    Plaintiffs are informed and believe and thereon allege that Steele Plumbing's

13  Commercial General Liability Policy was delivered to the Plaintiffs in the State of California and that

14  all premiums for the policy were paid in California.

15        45.    Plaintiffs are informed and believe and thereon allege that Plaintiffs were named as

16  additional insureds on the aforementioned Steele Plumbing policy.

17        46.    Plaintiffs are informed and believe and thereon allege that the aforementioned Steele

18  Plumbing Policy's essential contract terms provided insurance coverage to Plaintiffs as additional

19  insureds.

20        47.    On or about September 1, 2010, the Steins re-tendered the Stein Action to Lincoln

21  General requesting it evaluate its coverage position. The correspondence provided the insurance

22  certificate, information regarding the status of lawsuit, Plaintiffs' potential exposure on the claim, the

23  location of the document depository and provided the Cost to Repair and Defect List. Said

24  correspondence was sent via certified mail and facsimile. Proof of receipt by Lincoln General was

25  obtained. See letter with confirmation of receipt attached hereto as **Exhibit "I"** (enclosures omitted).

26  Lincoln General Insurance was, thus, on notice of the claim or loss.

27        48.    No response was received, and, thus, no defense or indemnity policy benefits were

28  received by Plaintiffs.

49.     On or about August 10, 2011, Lincoln General was put on notice via certified mail, return receipt and facsimile of the pending settlement between the Steins and Plaintiffs.   The transmittal included a copy of Plaintiffs' motion for good faith settlement determination that outlined the assignment of rights to a bad faith action.  Proof of receipt by Lincoln General was obtained.

50.     In response to this August 10, 2011 correspondence, Lincoln General, for the first time, issued a formal denial of coverage via correspondence dated September 23, 2011.  It appears that the denial was based solely on review of the Complaint in the Stein Action.  Plaintiffs are informed and believe and thereon allege that no other meaningful investigation was performed nor was any investigation of the relevant litigation documents performed.  A true and correct copy of the denial letter is attached as **Exhibit "J"** to this complaint and incorporated herein by this reference as though fully set forth at length.

51.     Plaintiffs are informed and believe and thereon allege that despite its failure to recognize and/or accept the tender of Plaintiffs, Lincoln General did in fact provide a defense and indemnity settlement funds to its named insured, Steele Plumbing for the Stein Action.

**Gemini Insurance**

52.     Plaintiffs are informed and believe and thereon allege that in or around February 2004, Coast Contracting & Development, Inc. purchased a written Commercial General Liability policy of insurance (Policy No. VCGP008343) from Gemini Insurance.  Coast Contracting & Development Inc.'s policy had effective dates of coverage of February 25, 2004 through February 26, 2005 (hereinafter "the Gemini Liability Policy").

53.     Plaintiffs are informed and believe and thereon allege that   Coast Contracting & Development Inc.'s Commercial General Liability Policy was delivered to the Plaintiffs in the State of California and that all premiums for the policy were paid in California.

54.     Plaintiffs are informed and believe and thereon allege that Plaintiffs were named as additional insureds on the aforementioned  Coast Contracting & Development Inc. policy.

55.     Plaintiffs are informed and believe and thereon allege that the aforementioned Steele Plumbing Policy's essential contract terms provided insurance coverage to Plaintiffs as additional insureds.

56. On or about August 25, 2009, Naylor tendered the Stein Action to Coast Contracting & Development, Inc., copying on the correspondence, Coast's attorneys, agent for service of process, and insurance broker. Gemini Insurance was, thus, on notice of the claim or loss.

57. On or about September 1, 2010, the Steins re-tendered the Stein Action to Gemini Insurance requesting it evaluate its coverage position. The correspondence provided the insurance certificate, information regarding the status of lawsuit, Plaintiffs' potential exposure on the claim, the location of the document depository and provided the Cost to Repair and Defect List. Said correspondence was sent via certified mail and facsimile. Proof of receipt by Gemini Insurance was obtained. See letter with confirmation of receipt attached hereto as **Exhibit "K"** (enclosures omitted).

58. No response was received, and, thus, no defense or indemnity policy benefits were received by Plaintiffs.

59. On or about August 10, 2011, Gemini Insurance was put on notice via certified mail, return receipt and facsimile of the pending settlement between the Steins and Plaintiffs. The transmittal included a copy of Plaintiffs' motion for good faith settlement determination that outlined the assignment of rights to a bad faith action. Proof of receipt by Gemini Insurance was obtained.

60. No response was received to this August 10, 2011 correspondence.

61. Plaintiffs are informed and believe and thereon allege that despite its failure to recognize and/or accept the tender of Plaintiffs, Gemini Insurance did in fact provide a defense and indemnity settlement funds to its named insured, Coast Contracting & Development, Inc. for the Stein Action.

**Actionable Conduct and Damages of Plaintiffs**

62. Plaintiffs are informed and believe and thereon allege that have performed all of their obligations under the policies identified above, except for those obligations which because of the breach by the Defendants of their obligations, Plaintiffs have been excused or prevented from performing.

63. Plaintiffs are informed and believe and thereon allege that the Defendants failed to conduct a prompt, full and complete investigation of the facts and circumstances giving rise to the claims asserted in the Stein Action. Defendants also failed and refused to accept or improperly denied the tender of the defense.

64.   Plaintiffs are informed and believe and thereon allege that the Defendants failed in their duties and obligations by the following which include but are not limited to:

        A.   Failing to conduct a prompt, full and complete investigation into the facts and circumstances of the claims asserted against Plaintiffs in the Stein Action and continued failure even after receipt of and being put on notice of additional information that may be relevant to their evaluation;

        B.   Failing and refusing to accept the defense of the Plaintiffs, from the claims asserted in the Stein Action;

        C.   Summarily denying Plaintiffs' claim with generally a mere reference only to the Steins' Complaint;

        D.   Failing and refusing to accept certain re-tenders of the defense of the Plaintiffs from the claims asserted in the Stein Action;

        E.   Continuing to delay in providing Plaintiffs their contractually bargained-for defense and ultimately refusing to defend Plaintiffs;

        F.   Using improper standards to deny Plaintiffs' tender of the defense;

        G.   Engaging in improper claims handling when Defendants were on notice of covered claims and failing to evaluate and/or re-evaluate their coverage determination;

        H.   Failing and refusing to defend the Plaintiffs from the claims asserted in the Stein Action;

        I.   Failing and refusing to indemnify the Plaintiffs from the claims asserted in the Stein Action;

        J.   Avoiding payment of Plaintiffs' claim by failing to accept the version of the facts surrounding the incident that formed the basis of the complaint in the Stein Action from the point of view of their insureds and instead accepted an incorrect version of facts that supported a basis to deny the claim for coverage; and

///

) 'Christian
.sylor\Pleadings\Complaint.w

K.     Failing to give at least as much consideration to Plaintiffs' welfare as Defendants gave to their own interests.

65.     Had the Defendants conducted a reasonable investigation of the claim, the Defendants would have learned, *inter alia*, that Plaintiffs had exposure in the Stein Action for claims covered by Naylor's Liability Policy, the Lincoln General Liability Policy, and the Gemini Liability policy.  The three insurance company policies are hereinafter collectively referred to as "the subject liability policies."

66.     The facts alleged in the Stein Action, as well as the additional information provided to Defendants, as well as information available to Defendants via the litigation materials, revealed that there was a potential for coverage under the policies mentioned herein.

67.     As a direct and proximate result of Defendants' wrongful refusal to provide Plaintiffs with the policy benefits, Plaintiffs incurred financial obligations to pay legal fees and court costs to defend itself in Stein Action.  Specifically,  Plaintiffs have incurred in excess of $65,000 in attorney fees and costs to date in defending the Stein Action.

68.     As a further direct and proximate result of Defendants wrongful refusal to provide Plaintiffs with the policy benefits, Plaintiffs have incurred and will continue to incur financial obligations to pay legal fees and court costs and interest to enforce claims for benefits due under the policy in the instant action.

69.     As a further direct and proximate result  of Defendants wrongful refusal to provide Plaintiffs with the policy benefits, Plaintiffs have suffered emotional distress.

## FIRST CAUSE OF ACTION

## BREACH OF CONTRACT

(As Against All Defendants and DOES 1-50)

70.     Plaintiffs hereby incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth at length.

71.     Plaintiffs are informed and believe and thereon allege that the subject liability polices form valid and enforceable contracts between Plaintiffs and Defendants.

Christian
aylor·Pleadings·Complaint w
1

72.     Plaintiffs are informed and believe and thereon allege that it, Steele Plumbing, and Coast Contracting & Development, Inc. paid all premiums as required under the subject liability policies.

73.     Plaintiffs are informed and believe and thereon allege that Defendants breached their obligations under the subject liability policies by the following which include but are not limited to:

    A.     Failing to conduct a prompt, full and complete investigation into the facts and circumstances of the claims asserted against Plaintiffs in the Stein Action and continued failure even after receipt of and being put on notice of additional information that may be relevant to their evaluation;

    B.     Failing and refusing to accept the defense of the Plaintiffs, from the claims asserted in the Stein Action;

    C.     Summarily denying Plaintiffs' claim with generally a mere reference only to the Steins' Complaint;

    D.     Failing and refusing to accept certain re-tenders of the defense of the Plaintiffs from the claims asserted in the Stein Action;

    E.     Continuing to delay in providing Plaintiffs their contractually bargained-for defense and ultimately refusing to defend Plaintiffs;

    F.     Using improper standards to deny Plaintiffs' tender of the defense;

    G.     Engaging in improper claims handling when Defendants were on notice of covered claims and failing to evaluate and/or re-evaluate their coverage determination;

    H.     Failing and refusing to defend the Plaintiffs from the claims asserted in the Stein Action;

    I.     Failing and refusing to indemnify the Plaintiffs from the claims asserted in the Stein Action;

    J.     Avoiding payment of Plaintiffs' claim by failing to accept the version of the facts surrounding the incident that formed the basis of the complaint in the Stein Action from the point of view of their insureds and instead accepted an

1   incorrect version of facts that supported a basis to deny the claim for coverage;

2   and

3   K.      Failing to give at least as much consideration to Plaintiffs' welfare as

4   Defendants gave to their own interests.

5   74.     Plaintiffs have performed all of their obligations under the contract identified above,

6   except for those obligations which because of the breach by the Defendants of their obligations,

7   Plaintiffs have been excused or prevented from performing.

8   75.     As a result of the failure and refusal of the Defendants breach of contract, the

9   Defendants and each of them are estopped from relying upon any subsequently discovered information

10  to support their rejection of Plaintiffs' claim for coverage in the Stein Action.

11  76.     As a result of the failure and refusal of the Defendants breach of contract, the

12  Defendants are deemed to have waived any obligation on the part of Plaintiffs to cooperate with the

13  Defendants in defense of the Stein Action.

14  77.     As a direct and proximate result of the breaches of contract by the Defendants

15  Plaintiffs have been damaged, injured and prejudiced.  Plaintiffs were required to retain counsel and

16  defend themselves against the claims asserted against them.  Due to Plaintiffs' limited financial

17  resources and Defendants denial of the defense, Plaintiffs engaged in limited discovery and as a result,

18  Plaintiffs' defense in the Stein Action was compromised.  Ultimately, Plaintiffs were also forced to

19  enter into a settlement in the Stein Action for financial reasons.  As a direct and proximate result of the

20  breach by the Defendants of their obligations under the subject liability policies, Plaintiffs have been

21  damaged as follows:

22  A.      Plaintiffs were required to retain attorneys and incur litigation costs to defend

23  themselves from the claims asserted in the Stein Action, all in an amount to be

24  proven at trial;

25  B.      Plaintiffs were required to enter into and pay a settlement of the claims asserted

26  in the Stein Action and agree to a stipulated judgment, all in an amount to be

27  proven at trial; and

28  C.      Plaintiffs suffered general damages in an amount to be proved at time of trial.

D.    Plaintiffs also seek prejudgment interest since the date of the breach.

Plaintiffs will seek leave of Court to amend this Complaint when such sums can be reasonably ascertained or will offer proof of same at the time of trial.

78.    As a further direct and proximate result of Defendants wrongful refusal to provide Plaintiffs with the policy benefits, Plaintiffs have suffered emotional distress.

79.    Plaintiffs are informed and believe and thereon allege that the denial of benefits, as alleged in this complaint, was vexatious and without reasonable cause. Pursuant to *Insurance Code* § 1619, Plaintiffs are entitled to reasonable attorney fees incurred in prosecuting this action. Plaintiffs will seek leave of Court to amend this Complaint when such sums can be reasonably ascertained or will offer proof of same at the time of trial.

80.    Plaintiffs also reserve the right to seek leave of court to amend this complaint and this cause of action to conform to proof and/or to provide additional allegations upon discovery.

## SECOND CAUSE OF ACTION

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

(As Against All Defendants and DOES 1-50)

81.    Plaintiffs hereby incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth at length.

82.    The subject liability policies contained an implied covenant by Defendants to act in good faith and deal fairly with Plaintiffs, and to do nothing to impair or interfere with Plaintiffs' rights under the policy.

83.    Plaintiffs are informed and believe and thereon allege that Defendants breached the implied covenant of good faith and fair dealing arising our of the subject liability policies by the following which include but are not limited to:

A.    Failing to conduct a prompt, full and complete investigation into the facts and circumstances of the claims asserted against Plaintiffs in the Stein Action and continued failure even after receipt of and being put on notice of additional information that may be relevant to their evaluation;

B. Failing and refusing to accept the defense of the Plaintiffs, from the claims asserted in the Stein Action;

C. Summarily denying Plaintiffs' claim with generally a mere reference only to the Steins' Complaint;

D. Failing and refusing to accept certain re-tenders of the defense of the Plaintiffs from the claims asserted in the Stein Action;

E. Continuing to delay in providing Plaintiffs their contractually bargained-for defense and ultimately refusing to defend Plaintiffs;

F. Using improper standards to deny Plaintiffs' tender of the defense;

G. Engaging in improper claims handling when Defendants were on notice of covered claims and failing to evaluate and/or re-evaluate their coverage determination;

H. Failing and refusing to defend the Plaintiffs from the claims asserted in the Stein Action;

I. Failing and refusing to indemnify the Plaintiffs from the claims asserted in the Stein Action;

J. Avoiding payment of Plaintiffs' claim by failing to accept the version of the facts surrounding the incident that formed the basis of the complaint in the Stein Action from the point of view of their insureds and instead accepted an incorrect version of facts that supported a basis to deny the claim for coverage; and

K. Failing to give at least as much consideration to Plaintiffs' welfare as Defendants gave to their own interests.

84. The denial of benefits claimed by Plaintiffs under the subject liability policies was done by the Defendants without reasonable cause. Defendants knew that a duty to defend was owed to Plaintiffs, yet refused to provide such a defense.

85. As a direct and proximate result of the unreasonable conduct of the Defendants Plaintiffs have been damaged, injured and prejudiced. Plaintiffs were required to retain counsel and

1   defend themselves against the claims asserted against them.  Due to Plaintiffs' limited financial

2   resources and Defendants denial of the defense, Plaintiffs engaged in limited discovery and as a result,

3   Plaintiffs' defense in the Stein Action was compromised.  Ultimately,  Plaintiffs were also forced to

4   enter into a settlement in the Stein Action for financial reasons.

5       86.  As a direct result of the tortious conduct of the Defendants, Plaintiffs were damaged and

6   injured.  Plaintiffs are therefore entitled to recover:

7         A.  Plaintiffs were required to retain attorneys and incur litigation costs to defend

8           themselves from the claims asserted in the Stein Action, all in amount to be

9           proven at trial;

10        B.  Plaintiffs were required to enter into and pay a settlement of the claims asserted

11          in the Stein Action and agree to a stipulated judgment, all in an amount to be

12          proven at trial; and

13        C.  Plaintiffs suffered general damages in an amount to be proved at time of trial.

14        D.  Reasonable attorneys fees incurred by Plaintiffs in obtaining policy benefits, in

15          an amount to be proved at time of trial.

16        E.  Plaintiffs also seek prejudgment interest since the date of the breach.

17      Plaintiffs will seek leave of Court to amend this Complaint when such sums can be reasonably

18  ascertained or will offer proof of same at the time of trial.

19      87.  As a further direct and proximate cause of Defendants' conduct, Plaintiffs have suffered

20  emotional distress.

21      88.  Plaintiffs are informed and believe and thereon allege that the Defendants intentionally

22  engaged in a course and scope of conduct which was intended to oppress the Plaintiffs and to dissuade

23  Plaintiffs, and their counsel, from seeking benefits due to the Plaintiffs under the policy.

24      89.  The refusal of the Defendants and each of them to carry out their obligations under the

25  insurance policy to investigate, defend, indemnify and to promptly communicate their coverage

26  position to their insureds, and the acts of their agents were all done with a conscious disregard of the

27  rights of the Plaintiffs to receive the benefits due them under the policy.  These acts were done with

28  the knowledge and approval and ratification of the Defendants and each of them.  These acts continued

Christan
...ler/Pleadings/Complaint.w

1  even after the Plaintiffs protested to the Defendants and Plaintiffs were powerless to obtain from the

2  Defendants compliance with their obligations.  Plaintiffs are therefore entitled to recover punitive

3  damages.

4       90.    Plaintiffs also reserve the right to seek leave of court to amend this complaint and this

5  cause of action to conform to proof and/or to provide additional allegations upon discovery.

6  <div align="center">**THIRD CAUSE OF ACTION**</div>

7  <div align="center">**Injunctive Relief and Restitution Pursuant**</div>

8  <div align="center">**To Business & Professions Code § 17200, et seq.**</div>

9  <div align="center">(As Against All Defendants and DOES 1-50)</div>

10       91.    Plaintiffs hereby incorporate by reference each and every allegation contained in the

11  foregoing paragraphs as though fully set forth at length.

12       92.    *Business and Professions Code* § 17200 *et seq.* precludes an entity from engaging in

13  unfair competition, defined as business practices which are unlawful, unfair, or fraudulent. *Business*

14  *and Professions Code* § 17203 permits the court to issue injunctive relief. *Business and Professions*

15  *Code* § 17204 permits individuals such as Plaintiffs to file an action on behalf of the general public to

16  obtain injunctive relief against entities which engage in unfair business practices.

17       93.    The actions of Defendants in delaying and/or denying benefits to its insureds despite

18  the fact that claims are covered constitutes an unfair business practice under *Business and Professions*

19  *Code* § 17200 *et seq.*

20       94.    Plaintiffs are informed and believe and thereon allege that Defendants have engaged

21  in and continue to engage in unlawful and unfair claims practices as alleged herein.

22       95.    Plaintiffs are informed and believe that thereon allege that the insureds of Defendants

23  have been denied coverage and will continue to be denied coverage due to the unlawful claims

24  practices of the Defendants.

25       96.    Due to the ongoing nature of the wrongful conduct of Defendants, Plaintiffs seek

26  injunctive relief prohibiting Defendants from denying benefits to insureds with covered claims solely

27  based on an overbroad and unfairly drafted policy exclusions and/or prohibiting Defendants from

28

1  denying benefits to insureds with covered claims solely based on unfair and unjust claims handling in
2  unreasonable interpretation of policy exclusions.

3       97.    Plaintiffs are informed and believe and thereon allege that no adequate remedy at law
4  lies for Defendants' continuing violations.

5       98.    Granting the injunctive relief Plaintiffs have requested will protect California residents
6  similarly situated as Plaintiffs from the ongoing wrongful conduct of Defendants, and prevent further
7  violations of *Business and Professions Code* § 17200 *et seq.*

8       99.    Granting the injunctive relief Plaintiffs have requested will protect and benefit other
9  California residents who are policyholders of Defendants who have had similar claims denied.

10       100.    Pursuant to *Civil Procedure Code* § 1021.5, Plaintiffs are entitled to reasonable
11  attorneys' fees and costs in incurred in prosecuting this claim.

12       101.    Plaintiffs also reserve the right to seek leave of court to amend this complaint and this
13  cause of action to conform to proof and/or to provide additional allegations upon discovery.

14  **FOURTH CAUSE OF ACTION**
15  **Declaratory Relief**

16       102.    Plaintiffs hereby incorporate by reference each and every allegation contained in the
17  foregoing paragraphs as though fully set forth at length.

18       103.    A dispute has arisen and actual controversy now exists between Plaintiffs and
19  Defendants, in that Plaintiff contends that all of the above-referenced losses they have suffered with
20  respect to the Stein Action are covered under the subject liability policies. Plaintiffs are informed and
21  believe and thereon alleges that Defendants dispute this contention and deny that Plaintiffs' losses are
22  covered.

23       104.    Plaintiffs desire a judicial determination of Defendants' rights, duties and obligations
24  under subject liability policies with respect to the claim set forth herein.

25       105.    Plaintiffs also reserve the right to seek leave of court to amend this complaint and this
26  cause of action to conform to proof and/or to provide additional allegations upon discovery.

27  **PRAYER**
28  WHEREFORE, PLAINTIFFS pray:

Christian
q:/cc Pleadings/Complaint w

A.     For damages according to proof for breach of contract, including costs of defense incurred by Plaintiffs in their defense of the claims of the Stein Action and the amounts paid in settlement of those claims, in an amount to be proved at time of trial;

B.     For general damages and compensatory damages including, but not limited to, injuries resulting from humiliation, mental anguish and emotional distress according to proof;

C.     For attorney fees incurred in bring this action pursuant to *Insurance Code* § 1619, in an amount to be proved at time of trial;

D.     For attorney fees incurred in obtaining policy benefits, as provided by law, in an amount to be proved at time of trial;

E.     For prejudgment interest pursuant to *Civil Code* § 3287 and/or any other provision of law providing for pre-judgment interest, in an amount to be proved at time of trial;

F.     For punitive damages in an amount sufficient to deter and make and example of Defendants;

G.     For a permanent injunction under the third cause of action enjoining Defendants, their agents, successors and employees and those acting in concert with them from engaging in each of the unlawful practices, policies, usages and customs set forth herein;

H.     For attorney fees in bringing the claim on the third cause of action for injunctive relief as provided in *Business and Professions Code* § 17200 *et seq.*;

I.     For an award of restitution on the third cause of action to all persons who were injured as a result of the unlawful practices, policies, usages and customs set forth herein;

J.     For costs of suit incurred herein; and

K.     For such other and further relief as the court may deem just and proper.

DATED: November 18, 2011        QUADE & ASSOCIATES, a PLC

By: _____

Michael W. Quade
Cheryl L. Gustafson
Attorneys for Plaintiffs

Christian
\.5\5\r-Pleadings-Complaint.w

# EXHIBIT A



P.O.BOX 91264 SAN DIEGO, CALIFORNIA 92169
PHONE (858) 337-1460: FAX (760) 944-0291
LICENSE # 810761

DATE 26 May 2004

Owner: Michael Aulert and Valerie Sherriff
1320 Summit Avenue, LLC.
1995 West 190 Street #202
Torrance, California 90504

Project Address: 1320, 1318 & 1316 Summit Avenue
Cardiff, California 92007

## Services Agreement

1.1   PROJECT:

The Scope of the Project is as follows ("Project"):

**Naylor Construction shall perform general contractor services for the building of three homes, unit 1 1320 Summit Avenue plans dated 5-3-2004, unit 2 1316 Summit Avenue plans dated 5-10-2004 and unit 3 1318 Summit Avenue plans dated 5-10-2004.**

2.1   SERVICES:

A.  Services to be performed by Naylor Construction shall include the following:

- ➢ Coordination, hiring and supervision of all subcontractors subject to owner review, consultation, and approval.
- ➢ Client meetings
- ➢ Building department requirements
- ➢ General project management
- ➢ Coordination of delivery of materials with owner
- ➢ Owner to select all finish building materials and colors. Contractor to timely notify owner when the above selections are necessary so as not to prolong the normal progression of project.
- ➢ Utilities will be stubbed outside of building.



2-2-10

EXHIBIT NO. 130

E. SMITH

VS004417



~~Owner understands that material alterations or deviations from the above Project specifications will be performed upon written amendment signed by both parties and may involve extra costs. Both owner and Naylor Construction agree that time is of the essence in this Project~~

3.1   **EXCLUSIONS:**

Any services not listed in this agreement are excluded from this contract, including but not limited to:

- Supervision and responsibility for any subcontractors hired by owner and not approved by Naylor Construction.
- Payment of all subcontractors.
- Owner shall coordinate the structural or functional changes to the plans with the project engineer or draftsman.
- Structural engineering
- Landscape design
- Grading
- Demolition
- All S.D.G.E. fees, trenching or related work.
- All sewer and water fees, trenching or related work.
- All phone and television fees, trenching or related work
- Civil engineering or surveyor to confirm setbacks, property lines or height certification.
- Soils engineer.
- Special inspection fees.
- Interior design
- Permit fees

4.1   **COMPENSATION:**

It is agreed that One Hundred and Sixty Thousand Dollars ($160,000) will compensate Naylor Construction for the Project payable as follows ("Payment"):

- 10% deposit of Sixteen Thousand Dollars ($16,000) will be payable upon execution of this Agreement.
- First payment of ten Thousand Dollars $10,000 shall be payable upon commencement of foundation.
- Ten Thousand Dollars $10,000 shall be payable on the first day of each month thereafter for eleven (11) months. Invoice to be submitted by the fifth day of previous month.
- Twenty Four Thousand Dollars $24,000 shall be payable at agreed completion of the project defined in document
- If the Project is completed earlier than anticipated, the remainder of the Payment will be rendered to Contractor within ten (21) days of completion.
- An additional payment of seven thousand dollars ($7,000) per building will be paid to Naylor Construction for insurance purposes. This fee will be paid seven thousand dollars ($7,000) six months into the Project and fourteen thousand dollars ($14,000) upon completion of the Project.

VS004418



Any work, requested by Owners, to be performed by Naylor Construction outside the scope of the Project, as set forth above, will be billed on an hourly basis according to the schedule of hourly rates listed below:

SCHEDULE OF HOURLY RATES

Christian Naylor              $ 60.00 / hour
Forman                       $ 40.00 / hour

It is estimated that the total project length to be ten (10) – fourteen (14) months. Both owner and naylor construction agree that time is of the essence for the project. Any stoppage to the project longer than fifteen (15) working days attributed to either party entitles other party to terminate project as set forth in paragraph 5.2 Owner has been fully informed that any stoppage to the Project not attributed to Naylor Construction could cause losses of key subcontractors and therefore, any stoppage which continues for longer than fifteen (15) working days may take a least that same amount of time to reassemble subcontractors.

5.1   ARBITRATION.

In the event that any controversy shall arise between the parties to this Agreement regarding the interpretations hereof or the performances of either party hereto, either party shall have the absolute right to have said controversy resolved by binding arbitration conducted by an arbitrator or arbitrators of the American Arbitration Association under Construction Industry Arbitration Rules. Either party hereto may, at any time period prior to the expiration of 90 days following the commencement of said controversy, file with the other party a demand in the form of a notice of intent to arbitrate and shall file two copies said notice with the San Diego Regional Office of the American Arbitration Association. The arbitration shall be conducted in San Diego County.

5.2   TERMINATION:

This agreement may be terminated by either party upon not less than ten days written notice should either party fail substantially to perform in accordance with the terms of this agreement through no fault of the party initializing the termination. If the Owners fail to make payments to the Contractor in accordance with this Agreement, such failure shall be considered substantial nonperformance of Services under this Agreement.   Upon termination by either party Naylor Construction shall retain all deposits or payments paid until the date of termination and reserve its right to collect all payments owed at date of termination.

By signing below we are agreeing to all the terms as they are listed on pages 1 through 3 in this agreement.

Contractor:                          Owner:

_____          Valen Shen  5/26/04

5/26/2004

VS004419

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent / ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
8/12

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

1. Article Addressed to:

Nancy Barrow
Litigation Specialist
Navigator Insurance
433 California St. Ste 100
San Francisco, CA 94104

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)   7011 1150 0001 7933 8849

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Jerry _____ ☐ Agent / ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
7/15/11

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

1. Article Addressed to:

Lincoln General Ins
Construction Defect Dept.
P.O. Box 3008
York, PA 17402-0028

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer)   7011 1150 0001 7934 5656

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent / ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
E.D. Colton   8-15-11

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

AUG 15 2011

1. Article Addressed to:

Geoffrey V. Pohl, Clms. Exmr
Vella Insurance Services
11516 Nicholas St. Ste 301
Omaha, NB 68154

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)   7011 1150 0001 7933 8832

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

# EXHIBIT B

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

| | OP ID KT COAST-2 | DATE (MM/DD/YYYY) 07/30/04 |
|---|---|---|

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. | | |
|---|---|---|---|
| ISU Insurance Services Bozzuto Agency #0C77495 ○○○0 Madison Ave, Suite #100 ..gevale CA 95662 ..one: 800.400.6394   Fax:800.286.0808 | | | |
| | INSURERS AFFORDING COVERAGE | | NAIC # |
| INSURED | INSURER A: Hartford Casualty Ins Co | | 22357 |
| Coast Contracting and Development, Inc. 7929 Silverton Avenue, #609 San Diego CA 92126 | INSURER B: Gemini Insurance Company | | |
| | INSURER C: | | |
| | INSURER D: | | |
| | INSURER E: | | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| B | X | **GENERAL LIABILITY** X COMMERCIAL GENERAL LIABILITY ☐ CLAIMS MADE X OCCUR | VCGP008343 | 02/26/04 | 02/26/05 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $50,000 |
| | | | | | | MED EXP (Any one person) | $5,000 |
| | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: X POLICY ☐ PROJECT ☐ LOC | | | | PRODUCTS - COMP/OP AGG | $1,000,000 |
| | | **AUTOMOBILE LIABILITY** ☐ ANY AUTO ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY** ☐ ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN EA ACC AUTO ONLY: AGG | $ |
| | | **EXCESS/UMBRELLA LIABILITY** ☐ OCCUR ☐ CLAIMS MADE ☐ DEDUCTIBLE ☐ RETENTION  $ | | | | EACH OCCURRENCE | $ |
| | | | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | | | | ☐ WC STATU- TORY LIMITS ☐ OTH- ER | |
| | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | | **OTHER** Property Section | 575BAAS3798 | 02/28/04 | 02/28/05 | BPP | 5,000 |
| A | | Equipment Floater | 575BAAS3798 | 02/28/04 | 02/28/05 | Rent/Leas | 100,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
*10 Day Cancellation Exception for Non Payment of Premium.
Certificate Holder is named Additional Insured along 1320 Summit Avenue LLC,
per attached form VE01820703.
RE: 1316, 1318, 1320 Summit Avenue, Cardiff, CA.

| CERTIFICATE HOLDER | NAYLORC | CANCELLATION |
|---|---|---|
| Naylor Construction P.O. Box 91264 San Diego CA 92169 | | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL *30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE |

ACORD 25 (2001/08)                                    © ACORD CORPORATION 1988

AUG - 5 ___

SUM006761

Policy Number: VCGP008343
Insured Name:COAST CONTRACTING AND
DEVELOPMENT INC
Number: 28

VE 0182 07 03

Effective Date: 02/26/2004

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# BLANKET ADDITIONAL INSURED ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. Section II – Who is An Insured is amended to include as an insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy.  Such person or organization is an additional insured only with respect to your ongoing operations performed for the insured. A person's or organization's status as an insured under this endorsement ends when your operations for that insured are completed.

B. With respect to the insured afforded these additional insureds, the following additional exclusions applies:

This insurance does not apply to:

1. The preparing, approving, of failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

2. Supervisory, inspection, architectural or engineering activities.

VE 0182 07 03

Page 1 of 1

SUM006762

# EXHIBIT C

Mar 07 08 11:10a

From: Jason Atamson At rapp & Associates insu...

p.10

# ACORD CERTIFICATE OF LIABILITY INSURANCE

OP ID: J2
STREEG-2

DATE (MM/DD/YY): 08/31/04

| | |
|---|---|
| **PRODUCER** rapp & Associates Insurance Services, Inc. 439 Camino del Rio So. #112 San Diego CA 92108 Phone: 619-908-3100  Fax:619-908-3110 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |

| **INSURERS AFFORDING COVERAGE** | NAIC # |
|---|---|
| INSURER A: Lincoln General Insurance Co | |
| INSURER B: Mercury Casualty Group | 27988 |
| INSURER C: State Compensation Ins Fund | |
| INSURER D: | |
| INSURER E: | |

**INSURED**
Steele Plumbing
Joseph Steele
P.O. Box 2264
El Cajon CA 92021

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | **GENERAL LIABILITY** [X] COMMERCIAL GENERAL LIABILITY [ ] CLAIMS MADE [X] OCCUR | 25370282590 | 03/01/04 | 03/01/05 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $100,000 |
| | | | | | | MED EXP (Any one person) | $5,000 |
| | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: [ ] POLICY [ ] PRO-JECT [ ] LOC | | | | PRODUCTS - COMP/OP AGG | $ Included |
| B | | **AUTOMOBILE LIABILITY** [ ] ANY AUTO [ ] ALL OWNED AUTOS [X] SCHEDULED AUTOS [ ] HIRED AUTOS [ ] NON-OWNED AUTOS $250 Comp $500 Coll | AC11060104 | 07/01/04 | 07/01/05 | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | BODILY INJURY (Per person) | $100,000 |
| | | | | | | BODILY INJURY (Per accident) | $300,000 |
| | | | | | | PROPERTY DAMAGE (Per accident) | $100,000 |
| | | **GARAGE LIABILITY** [ ] ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN  EA ACC AUTO ONLY:   AGG | $ $ |
| | | **EXCESS/UMBRELLA LIABILITY** [ ] OCCUR [ ] CLAIMS MADE [ ] DEDUCTIBLE [ ] RETENTION  $ | | | | EACH OCCURRENCE | $ |
| | | | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| C | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | 229283142004 | 06/18/04 | 06/01/05 | [X] WC STATU-TORY LIMITS [ ] OTH- ER | |
| | | | | | | E.L. EACH ACCIDENT | $1000000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $1000000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $1000000 |
| | | **OTHER** | | | | | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
RE:Plumbing, installing and suppling all waste vent and water and gas to all
fixters on plans operations @ 1520 summit Ave LLC 1995 W. 190th St. ste 202
. Certificate holder is named additional insured per the attached AI 2010 03
97 endorsement. 10* days notice of cancellation in the event of nonpayment o
f premium.

| CERTIFICATE HOLDER | NAYLORC | CANCELLATION |
|---|---|---|
| Naylor Construction 1064 Neptune Ave. Encinitas CA 92024 | | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL   30*   DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE |

ACORD 25 (2001/08)

© ACORD CORPORATION 1988

nc 000011

# EXHIBIT D

QUADE & ASSOCIATES, a PLC
MICHAEL W. QUADE, ESQ.       [S.B. # 171930]
CHERYL GUSTAFSON, ESQ.       [S.B. # 234490]
3377 Carmel Mountain Road, Suite 250
San Diego, California 92121
Tel: (858) 642-1700
Fax: (858) 642-1778

Attorneys for Plaintiffs,

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO-HALL OF JUSTICE

| | |
|---|---|
| STEPHEN R. STEIN as trustee for THE STEIN FAMILY TRUST; TOVA STEIN as trustee for THE STEIN FAMILY TRUST; STEPHEN R. STEIN, an individual; and TOVA STEIN, an individual, | CASE NO. 37-2008-00092426-CU-CO-CTL |

Plaintiffs,

v.

MICHAEL F. AULERT, an individual; 1320 SUMMIT AVE., LLC, a California limited liability company; MAIN STREET PARTNERS & ASSOCIATES, INC., a California corporation; ADC COMFORT, INC. dba ADC HEATING & AIR, a California corporation; DCC, a California general partnership; DCC, INC., a California corporation; NAYLOR CONSTRUCTION, INC., a California corporation; COAST CONTRACTING AND DEVELOPMENT, INC., a California corporation; GREATER D & D PLUMBING, INC., a California corporation; STEELE PLUMBING, INC., a California corporation; DAWSON CONSTRUCTION, an entity of unknown form; TERRY MERSY ROOFING, an entity of unknown form; CMM ENTERPRISES, INC., dba PREMIER CABINETS, a California corporation; MARK LANGER MASONRY & LANDSCAPE, a California corporation; DG DESIGN & DRAFTING, an entity of unknown form; COLDWELL BANKER RESIDENTIAL BROKERAGE COMPANY, a California corporation; DAVID MILLER, an individual; and DOES 1 through 100, inclusive,

Defendants.

I/C JUDGE: RONALD L. STYN
DEPT: 62

### COMPLAINT FOR DAMAGES

1. **Strict Liability**
2. **Breach of Contract**
3. **Breach of Implied Warranties**
4. **Breach of Express Warranties**
5. **Negligence- Count One**
6. **Negligence Per Se**
7. **Negligent Misrepresentation**
8. **Negligence- Count Two**
9. **Breach of Fiduciary Duty**

### JURY TRIAL DEMANDED

STEPHEN R. STEIN as trustee for THE STEIN FAMILY TRUST, TOVA STEIN as trustee for THE STEIN FAMILY TRUST; STEPHEN R. STEIN, an individual; and TOVA STEIN, an individual, (hereinafter collectively referred to as "Plaintiffs") for the causes of action against Defendants MICHAEL F. AULERT, an individual; 1320 SUMMIT AVE., LLC, a California limited liability company; MAIN STREET PARTNERS & ASSOCIATES, INC., a California corporation; ADC COMFORT, INC. dba ADC HEATING & AIR, a California corporation; DCC, a California general partnership; DCC, INC., a California corporation; NAYLOR CONSTRUCTION, INC., a California corporation; COAST CONTRACTING AND DEVELOPMENT, INC., a California corporation; GREATER D & D PLUMBING, INC., a California corporation; STEELE PLUMBING, INC., a California corporation; DAWSON CONSTRUCTION, an entity of unknown form; TERRY MERSY ROOFING, an entity of unknown form; CMM ENTERPRISES, INC., dba PREMIER CABINETS, a California corporation; MARK LANGER MASONRY & LANDSCAPE, a California corporation; DG DESIGN & DRAFTING, an entity of unknown form; COLDWELL BANKER RESIDENTIAL BROKERAGE COMPANY, a California corporation; DAVID MILLER, an individual; and DOES 1 through 100, inclusive, and each of them, allege as follows:

## GENERAL ALLEGATIONS

### THE PLAINTIFFS

1.     Plaintiffs STEPHEN R. STEIN and TOVA STEIN are trustees for the STEIN FAMILY TRUST. The STEIN FAMILY TRUST at all times relevant herein, purchased and currently owns the real property subject of the instant suit located at 1316 Summit Ave., Cardiff, California, County of San Diego, State of California (hereinafter "Property.")

2.     Plaintiffs STEPHEN R. STEIN and TOVA STEIN at all times relevant herein, were and are residents of the County of San Diego, State of California, and are individuals who resided at the Property.

### THE DEVELOPER DEFENDANTS

3.     Plaintiffs are informed and believe and thereon allege that at all times relevant herein, Defendant MICHAEL F. AULERT (hereinafter "AULERT"), was and is an individual who is a developer, doing business in the County of San Diego, State of California. AULERT is also the

principal and developer who established Defendant 1320 SUMMIT AVE., LLC. Plaintiffs are further informed and believe and thereon allege that at all times relevant herein, AULERT was an authorized agent of 1320 SUMMIT AVE., LLC.

4.      Plaintiffs are informed and believe and thereon allege that at all times relevant herein, Defendant 1320 SUMMIT AVE., LLC (hereinafter "SUMMIT"), was and is a California limited liability company established by AULERT, doing business in the County of San Diego, State of California.

5.      Plaintiffs are informed and believe and thereon allege that MAIN STREET PARTNERS & ASSOCIATES, INC. (hereinafter "MAIN STREET"), was and is a California corporation, doing business in the County of Los Angeles, State of California. Plaintiffs are informed and believe and thereon allege that MAIN STREET is the corporation that managed SUMMIT.

6.      Plaintiffs are informed and believe and thereon allege that SUMMIT was engaged in the business of designing, planning, developing, constructing and selling high end, luxury homes in San Diego County, State of California.

7.      AULERT, SUMMIT, and MAIN STREET are sometimes collectively referred to herein as "DEVELOPER DEFENDANTS."

### THE AIR CONDITIONING CONTRACTOR

8.      Plaintiffs are informed and believe and thereon allege that ADC COMFORT, INC. dba ADC HEATING & AIR (hereinafter "ADC") was and is a California corporation doing business in the County of San Diego, State of California.  ADC contracted with Plaintiffs directly for installation of the heating and air conditioning systems.

### THE CONTRACTORS HIRED BY THE DEVELOPER

9.      Plaintiffs are informed and believe and thereon allege that DCC (hereinafter "DCC") is a California general partnership.  Plaintiffs are informed and believe and thereon allege that the principals of DCC are Joseph P. Sandy and Albert M. Frontiera.

10.     Plaintiffs are informed and believe and thereon allege that DCC, INC. (hereinafter "DCCI") was and is a California corporation doing business in the County of San Diego, State of California.

11.     Plaintiffs are informed and believe and thereon allege that NAYLOR CONSTRUCTION, INC., (hereinafter "NAYLOR") was and is a California corporation doing business in the County of San Diego, State of California.

12.     Plaintiffs are informed and believe and thereon allege that COAST CONTRACTING AND DEVELOPMENT, INC., (hereinafter "COAST CONTRACTING") was and is a California corporation doing business in the County of San Diego, State of California.

13.     Plaintiffs are informed and believe and thereon allege that GREATER D & D PLUMBING, INC., (hereinafter "D & D") was and is a California corporation doing business in the County of San Diego, State of California.

14.     Plaintiffs are informed and believe and thereon allege that STEELE PLUMBING, INC., (hereinafter "STEELE PLUMBING") was and is a California corporation doing business in the County of San Diego, State of California.

15.     Plaintiffs are informed and believe and thereon allege that DAWSON CONSTRUCTION, (hereinafter "DAWSON") was and is an entity of unknown form doing business in the County of San Diego, State of California.

16.     Plaintiffs are informed and believe and thereon allege that TERRY MERSY ROOFING, (hereinafter "TERRY MERSY") was and is an entity of unknown form doing business in the County of San Diego, State of California.

17.     Plaintiffs are informed and believe and thereon allege that CMM ENTERPRISES, INC., dba PREMIER CABINETS, (hereinafter "PREMIER") was and is a California corporation doing business in the County of San Diego, State of California.

18.     Plaintiffs are informed and believe and thereon allege that MARK LANGER MASONRY & LANDSCAPE, (hereinafter "MARK LANGER") was and is a California corporation doing business in the County of San Diego, State of California.

19.     DCC, DCCI, NAYLOR, COAST CONTRACTING, D&D, STEELE PLUMBING, DAWSON, TERRY MERSY, PREMIER, and MARK LANGER are sometimes collectively referred to herein as "SUBCONTRACTOR DEFENDANTS."

-4-

### THE DRAFTSMAN

20.   Plaintiffs are informed and believe and thereon allege that DG DESIGN & DRAFTING (hereinafter "DG DESIGN") was and is an entity of unknown form doing business in the County of San Diego, State of California.

### THE REAL ESTATE AGENT

21.   Plaintiffs are informed and believe and thereon allege that COLDWELL BANKER RESIDENTIAL BROKERAGE COMPANY (hereinafter "COLDWELL") was and is a California corporation doing business in the County of San Diego, State of California.

22.   Plaintiffs are informed and believe and thereon allege that DAVID MILLER, an individual, (hereinafter "MILLER"), was and is an individual who is a real estate associate with COLDWELL doing business in the County of San Diego, State of California.

### THE DOE DEFENDANTS

23.   Defendants DOES 1 through 100, inclusive, are sued herein by their fictitious names pursuant to the provisions of *Code of Civil Procedure* section 474. Their true names and capacities are unknown to Plaintiffs and Plaintiffs will seek leave to amend this complaint to insert their true names and capacities when ascertained. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named defendants is in some manner responsible for Plaintiffs damages as alleged herein, and that Plaintiffs' damages are proximately caused by the wrongful conduct of said defendants, including, but not limited to, their failure to perform duties owed by them to Plaintiffs, both *ex contractu* and *ex delicto*.

24.   The acts of Defendants and DOES 1 through 100, inclusive, and each of them were and are the agents of the other Defendants.

25.   DOES 1 through 100, inclusive, whether individual, corporate, associate, alter ego, or otherwise, are fictitious names of Defendants whose true names and capacities, at this time, are unknown to Plaintiffs; Plaintiffs are informed and believe and thereupon allege that at all times herein mentioned, each Defendant sued herein as a DOE was acting for itself or its agent, servant, employee, and/or alter ego of its Co-Defendants, and in doing the things hereinafter mentioned, was acting in the course and scope of its authority as such agent, servant, employee, and/or alter-ego, and with the

permission and consent of its Co-Defendants; and that each of said fictitiously named Defendants,

whether acting for itself or as agents, corporations, associations, or otherwise, is in some way liable

or responsible to Plaintiffs on the facts hereinafter alleged, and caused injuries and damages

proximately thereby, as hereinafter alleged, and at such times as Defendants' true names and capacities

become known to Plaintiffs, Plaintiffs will ask leave of this court to amend this Complaint to insert

said true names and capacities.

26.     Plaintiffs are informed and believe, and thereon allege, that at all relevant times, each

and every Defendant was acting as the duly authorized agent of each and every other Defendant, such

that each Defendant is liable for each and every wrong committed by each and every other Defendant.

## FACTUAL ALLEGATIONS

27.     Plaintiffs are informed and believe, and thereon allege, that on or about March 3, 2003,

SUMMIT and AULERT became the owner of real property located at 1316 Summit Avenue, Cardiff,

California.

28.     Plaintiffs are informed and believe, and thereon allege, that the Property was developed

by AULERT who established 1320 SUMMIT AVE, LLC. The LLC was established to build three new

homes on the subject parcel.  Thus, addition to the subject Property, the project consisted of the

construction of two other single-family homes: 1318 Summit Ave. and 1320 Summit Ave.

29.     Plaintiffs are informed and believe, and thereon allege, that in or around January 2004,

SUMMIT and AULERT hired DG DESIGN to draft and/or complete drafting the plans and

specifications governing the construction of the subject Property.

30.     Plaintiffs are informed and believe, and thereon allege, that sometime before January

2004, SUMMIT and AULERT hired Valerie Sherriff to serve as the project manager at the subject

Property to oversee construction and assist in decision-making processes at the subject Property. Ms.

Sherriff acted as an agent of SUMMIT.

31.     Plaintiffs are informed and believe, and thereon allege, that in or around 2004,

SUMMIT and/or AULERT entered into a construction contract with NAYLOR, to construct high-end

luxury homes at the subject Property.

32.     Plaintiffs are informed and believe, and thereon allege, that SUMMIT and AULERT also entered into contractual arrangements with various subcontractors that were to be hired by NAYLOR to assist with construction of the residence at the subject Property.

33.     NAYLOR and certain subcontractors commenced construction in 2005, but in or around 2005, NAYLOR was terminated and SUMMIT hired DCC to finish construction of the residence on the subject Property. Plaintiffs are informed and believe and thereon allege that on or about July 8, 2005, SUMMIT and DCC entered into a service agreement wherein DCC was to serve as the general contractor on the project. Pursuant to the service agreement, at the time DCC was hired all foundation and underground plumbing had been completed.

34.     In or around the fall of 2006, Plaintiffs were actively involved in looking for a home to purchase in northern San Diego County. Their two children were grown and out of the house, and they were looking for a comfortable home to enjoy themselves in their retirement years. Around that time, Plaintiffs noticed the subject Property, a newly constructed, ocean-view home in Cardiff.

35.     The parties utilized MILLER of COLDWELL to serve as the dual agent for both the buyers and seller. See disclosure regarding real estate agency relationships attached hereto as Exhibit "A" and incorporated fully by this reference.

36.     Plaintiffs are informed and believe and thereon allege that MILLER was present at the subject Property during various stages of construction.

37.     The Property has approximately 4,000 square feet of living space, two car garage, four-bedroom, four and one-half baths, and is situated walking distance from the ocean, with expansive ocean views to the west from the rear of the residence. The home is built on four levels, with the bottom level built subterranean and consisting of a basement theater room, two bedrooms, and two bathrooms. The entry level consists of the garage, kitchen, dining and living space, and a powder room. The third level consists of the master bedroom, master bathroom, and laundry area. The fourth level consists of a third bedroom and bathroom.

38.     Plaintiffs are informed and believe and thereon allege that pursuant to the Notice of Completion recorded with the County of San Diego, the Property was completed on November 25, 2006.

39.     On or about November 6, 2006, Plaintiffs made an offer to purchase the Property.

40.     After three counter-offers, the parties to the contract reached an agreement for sale. The agreed upon purchase price was $2,150,000.00.  See California Residential Purchase Agreement attached hereto as Exhibit "B" and incorporated fully by this reference.

41.     Prior to close of escrow on the Property, AULERT completed various disclosure statements.  See disclosures attached hereto as Exhibit "C" and incorporated fully by this reference. AULERT represented material facts to Plaintiffs when he stated on behalf of SUMMIT on the *Seller Property Questionnaire*, page one, that he had no knowledge of:

> "defect in any of the following, (including past defects that have been repaired) heating, air conditioning, electrical, plumbing (including the presence of polybutelene pipes), water, sewer, waste disposal or septic system, sump pumps, roof, gutters, chimney, fireplace, foundation, crawl space, attic, soil, grading, drainage, retaining walls, interior or exterior doors, windows, walls, ceilings, floors or appliances"

42.     AULERT further represented material facts to Plaintiffs when he stated on behalf of SUMMIT on the *Seller Property Questionnaire*, page two, that he had no knowledge of:

> "water intrusion into any part of any physical structure on the Property; leaks from or in any appliance, pipe, slab or roof; standing water, drainage, flooding, underground water, moisture, water-related soil settling or slippage on or affecting the Property" and "Any problem with or infestation of mold, mildew, fungus or spores, past or present, or affecting the Property."

43.     AULERT further represented material facts to Plaintiffs when he stated on behalf of SUMMIT on the *Real Estate Transfer Disclosure Statement*, page two, that he had no knowledge of: "Substances, materials, or products which may be an environmental hazard . . ." and that he had no knowledge of "flooding, drainage or grading problems."

44.     Prior to close of escrow on the Property, MILLER completed an agent's disclosure statement.  See agent's disclosures at  *Real Estate Transfer Disclosure Statement*, page two. MILLER's disclosures made no mention of any construction defects or related damage at the subject Property.

45.     Based on the disclosures made by SUMMIT, AULERT, COLDWELL, and MILLER, Plaintiffs proceeded with the purchase of the Property, which they would not have done had they been aware that the representations made by SUMMIT, AULERT, COLDWELL, and MILLER were false, or had they been aware of the true nature and quality of the Property to be purchased.

46.     The home closed escrow on December 13, 2006, and Plaintiffs moved in on or about that date.

47.     As part of the sale, Plaintiffs agreed to hire their own air conditioning contractor to complete installation of the heating and air conditioning systems. Plaintiffs hired ADC who performed their work in or around January 2007. See a copy of the contract between ADC and Plaintiffs attached hereto as Exhibit "D" and incorporated fully by this reference.

48.     Prior to the inception of ADC's work in January 2007, Plaintiffs had to contact SUMMIT as ADC required the SUMMIT's air conditioning subcontractor return to fix a leaking line prior to their work.

49.     Plaintiffs spent the next eight months working diligently to finish their home with custom details including built-ins; custom cabinet staining; wallpaper; paintings; sculptures; furnishings; wall treatments; window treatments; theater room furnishings; outdoor furnishings, etc.

50.     Just as soon as Plaintiffs had finished their home interior and thought their work was complete, they discovered significant water-intrusion issues during the summer of 2007, which has changed their lives ever since.

51.     In or around July 2007, the Plaintiffs noticed a leak on the ceiling in the basement/theater room.  It first appeared as water dripping from the sprinkler head after the air conditioning was turned on.  Upon further examination, there was also water found in the powder room vanity above the theater room ceiling. The source of the water turned out to be water leaking from an air conditioning condensate line that was never completed.  ADC acknowledged that when they installed the units earlier in the year, they missed the fact that the line was not completed.  Likewise, the developer, SUMMIT, also failed to notice the mistake or disclose same upon sale of the home.

52.     That summer, after the stain appeared, Plaintiffs hired Connie Jenkins of Environmental Testing & Technologies to investigate the water intrusion problems in the basement, pantry and powder room for water intrusion related damage.

53.     Plaintiffs also hired Building Restoration to restore the discovered water damaged areas. As Building Restoration and his team began to follow the water damage, it seemed there was no end to the water damage as the entire lower level and significant portions of the entry level were affected.

54.     Contemporaneous to the investigation of the A/C condensate line leak, Building Restoration also discovered a black water leak from a crimped wax ring in the master bathroom toilet installed by SUMMIT's plumbing subcontractor, D & D.

55.     Contemporaneous to the discovery of the water leaks, Plaintiffs began to feel ill, lethargic and not themselves. Ms. Stein in particular began to experience headaches, disorientation, burning, itching eyes and ears, dry cough, shortness of breath, shingles, and emotional distress. Mr. Stein also experienced health related and/or exacerbation of certain disease symptoms.

56.     Plaintiffs contacted and put SUMMIT and AULERT on notice via their agent, Valerie Sherriff, regarding the various issues at the Property as she served as the principal point of contact with SUMMIT and AULERT.

57.     Plaintiffs were advised to re-locate from the home. In mid-September 2007, Plaintiffs moved out of the home and have not been living in it since that date due to their health concerns. Even when Plaintiffs do return to the home to collect various items or attend a site inspection, they immediately notice their symptoms reappear.

58.     To this date, and after having re-located outside of the home, Ms. Stein continues to be under doctor's care for lingering repercussions related to her exposure.

59.     Prior to the filing of the instant complaint Plaintiffs have hosted numerous site inspections and permitted destructive testing. Plaintiffs have hired experts to continue to investigate the numerous construction defects existing at the subject property. These inspections have revealed non conforming, substandard, and defective conditions resulting in extensive damage to the subject Property including but not limited to the following items: serious water damage to all interstitial spaces opened up to date; defective drainage; defective waterproofing systems; defective framing; defective foundation systems; defective retaining walls; defective plumbing; defective sprinkler systems; defective drywall; defective heating and air conditioning systems; poor landscaping; defective

irrigation installation; defective roofing systems and resultant damages. (Hereinafter the construction-related items are collectively referred to as "Defective Conditions.")

60.    Plaintiffs are informed and believe and thereon allege that SUMMIT, AULERT, and MAIN STREET also employed the use of unlicensed and/or untrained contractors in completing construction of the subject Property.

61.    At present time, Building Restoration has removed certain portions of the drywall in the home. The exposed areas of the home have been sealed by Building Restorations but have not yet been re-constructed.  Every single area opened up to date shows evidence of water damage.

62.    Plaintiffs are informed and believe and thereon allege that the resultant damage extends beyond the areas opened-up to date.  There also likely remain numerous other defects existing at the Property.  Plaintiffs continue to investigate the Defective Conditions to determine the extent of the damages.  Accordingly, Plaintiffs reserve their right to amend and modify their list of Defective Conditions upon further discovery.

63.    On or about February 8, 2008, Plaintiffs, SUMMIT, AULERT, ADC, and DCC participated in a mediation with James E. Chodzko, Esq.  This mediation was compliant with paragraph 17(A) of the California Residential Purchase Agreement. The parties have continued their efforts to work toward resolution with the mediator.

I.

**FIRST CAUSE OF ACTION**

**Strict Liability**
**(Alleged by Plaintiffs against SUMMIT and DOES 1 - 25)**

64.    Plaintiffs reallege and incorporate by reference the foregoing and subsequent paragraphs as though fully set forth herein.

65.    Plaintiffs are informed and believe and thereupon allege that SUMMIT and DOES 1-25, as owners and developers of the Property, commenced to develop and construct the above-described Property and structure thereupon, which structure was intended to be used, was and is used as a single-family-residential-dwelling unit; that at all times herein mentioned SUMMIT and DOES 1-25 intended to and did act as developers, builders, owners, and/or sellers of said Property.

11
COMPLAINT

66.     Plaintiffs are informed and believe and thereupon allege that SUMMIT and DOES 1-25, were and are involved in the business of developing, constructing, and/or selling single-family-residential-dwelling units to the public.

67.     Plaintiffs are informed and believe and thereupon allege that the above-described Property was not constructed in a proper fashion in that it was defectively designed and built, and the Property and structure have suffered substantial resultant damage as a direct and proximate consequence.

68.     Plaintiffs are further informed and believe and thereupon allege that the above-described Property was not constructed in a proper fashion in the following particulars, including, but not limited to: serious water damage to all interstitial spaces opened up to date; defective drainage; defective waterproofing systems; defective framing; defective foundation systems; defective retaining walls; defective plumbing; defective sprinkler systems; defective drywall; defective heating and air conditioning systems; poor landscaping; defective irrigation installation; defective roofing systems and resultant damages.

69.     Plaintiffs are informed and believe and thereupon allege that the above-described defective conditions of the subject Property and structures arose out of, were attributable to, and are directly and proximately caused by, the above-described latent deficiencies in the design, planning, development, supervision, construction, improvement, and/or location of the subject Property and structures. Prior to the time of Plaintiffs' discovery of the facts set forth herein, Plaintiffs could not reasonably have discovered the existence of the above-described defective condition by the exercise of reasonable diligence.

70.     Plaintiffs are informed and believe and thereupon allege that said Property and structures have been inadequately constructed, developed, designed, supervised, located, or otherwise improved such that the Property and structures and parts thereof, have evidenced resultant damage so that the Property and structures in their present condition are defective, not of merchantable quality, and not fit for the purpose of permitting the residents to reside therein in a normal and usual fashion.

71.     SUMMIT and DOES 1-25 knew or reasonably should have known that the persons who would purchase the subject Property and the structures thereon would do so without destructive testing which would reveal the existence of the defects set forth herein.

72.     Since the completion of the structures on the subject Property, Defective Conditions have surfaced as herein alleged and that the said defects were not apparent by reasonable inspection at the time of the purchase herein.

73.     The Plaintiffs relied upon the skill, knowledge, and expertise of SUMMIT and DOES 1-25 herein in the development and construction of the Property and their representations that it was reasonably fit for its intended purpose.

74.     In or around July 2007, Plaintiffs became aware of the facts which informed them that the subject Property and structures were defective as herein alleged, were not fit for their intended purposes, and were not prepared or erected in a reasonable and workmanlike manner.

75.     SUMMIT and DOES 1-25, as mass producers and developers of the Property and structures, are strictly liable and responsible to the Plaintiffs for all damages suffered as a result of the above described defective conditions and resultant damage.

76.     As a direct and proximate result of the defects set forth herein, Plaintiffs have suffered damages in an amount precisely unknown, but in excess of the Court's minimum jurisdiction amount in cost of repair and/or reconstruction costs and in lost value to the Property.  Said resultant damage will be demonstrated in a precise manner and according to proof at the time of trial.

77.     As a further direct and proximate result of the defective condition of the subject structure and its consequent unmarketable nature, Plaintiffs' interest in said Property and structures and/or their equity therein has been destroyed or substantially reduced.

78.     Plaintiffs reserve the right to seek leave of the Court to amend this complaint to conform to proof and/or add additional allegations upon discovery.

//

//

//

//

## II.

## SECOND CAUSE OF ACTION

### Breach of Contract
### (Alleged by Plaintiffs against SUMMIT, ADC and DOES 1 - 25)

79.     Plaintiffs reallege and incorporate by reference the foregoing and subsequent paragraphs as though fully set forth herein.

80.     On or about November 6, 2006, Plaintiffs, SUMMIT and DOES 1-25 entered into negotiations for the purchase by Plaintiffs of property SUMMIT and DOES 1-25 owned located at 1316 Summit Ave., Cardiff, California, County of San Diego, State of California. The parties entered into a written New Construction Residential Purchase Agreement (hereinafter "Purchase Agreement") attached hereto as Exhibit "B" and incorporated fully by this reference wherein the parties agreed to terms governing a transaction for the sale of the Property developed, designed and constructed by SUMMIT, AULERT and DOES 1-25.

81.     According to said Purchase Agreement, Plaintiffs were to provide monetary consideration in escrow, and SUMMIT and DOES 1-25 was to convey real property and improvements thereon according to terms set forth in the contract.

82.     Under the terms of the Purchase Agreement, Plaintiffs have provided the monetary consideration required of them and SUMMIT and DOES 1-25 have conveyed the real property and improvements thereon.

83.     Plaintiffs have at all times performed the terms of the Purchase Agreement in the manner specified by the Purchase Agreement.

84.     As part of the sale of the Property, SUMMIT and DOES 1-25 provided Plaintiffs with various disclosures completed by AULERT on behalf of SUMMIT.  A copy of the disclosure statements are attached hereto as Exhibit "C."  Plaintiffs relied on the representations set forth in the disclosure statement in entering into the Purchase Agreement.  Said disclosure statements were incorporated into the Purchase Agreement.

85.     Plaintiffs are informed and believe and thereupon allege that SUMMIT and DOES 1-25 breached the Purchase Agreement by providing Property which contained Defective Conditions as set

14
COMPLAINT

forth in paragraph 59, *supra*, and improvements that were defective in that they were improperly designed, developed, and/or constructed. SUMMIT and DOES 1-25 further breached the Purchase Agreement by their use of unlicensed and/or untrained contractors in constructing the Property.

86.   SUMMIT and DOES 1-25 breach with regard to the Defective Conditions as herein alleged was to the detriment of Plaintiffs.

87.   On or about November 21, 2006, Plaintiffs also entered into a contract with ADC, the scope of work which included: (1) installation of Trane XL14i Energy Star Cooling System (two units) (2) installation of Trane Clean Effects Air Cleaner System (two units) and (3) completion of high voltage electrical, refrigeration and drain connections.  Said contract included a provision that the Installer would complete the installation in a workmanlike manner and in accordance with all applicable codes and ordinances.  The contract totaled $12,724.00.  See contract attached hereto as Exhibit "D" and incorporated fully by this reference.

88.   Plaintiffs paid the contracted amount to ADC and performed all of the things that the contract required that Plaintiffs do.

89.   ADC breached their contract with Plaintiffs by failing to perform their work at the Property in a workmanlike manner as required by the contract resulting in a significant water leak and resultant damage to Plaintiffs' home.

90.   As a direct and proximate result of the breach by SUMMIT and ADC, Plaintiffs have suffered damages in an amount precisely unknown, but in excess of the Court's minimum jurisdiction amount in cost of repair and/or reconstruction costs and in lost value to the Property.  Plaintiffs will establish the precise amount of damages at trial, according to proof.

91.   As a further direct and proximate result of said breach by SUMMIT and ADC, Plaintiffs have suffered damages in an amount not precisely known but in excess of this Court's minimum jurisdictional amount in that the Property has been and will be rendered valueless, substantially reduced in value and/or unmarketable. As such, Plaintiffs' interest in said Property and structures and their equity therein has been destroyed or substantially reduced. Plaintiffs will establish the precise amount of damages at trial, according to proof.

92.     As a further direct and proximate result of the actions alleged herein, Plaintiffs have suffered damages, including, but not limited to: emotional distress damages; personal injuries; medical expenses; loss of consideration paid under the Purchase Agreement; carrying costs of the home; loss of investment capital; costs of repairs and improvements; taxes paid; attorneys' fees; expert costs; mediator costs; escrow and closing costs; depreciation of value of subject residence; and interest, all in an amount in excess of the current jurisdictional limits to be shown according to proof at the time of trial.

93.     In addition Section 22 of the Purchase Agreement with SUMMIT, states specifically that "In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorney's fees and costs from the non-prevailing Buyer or Seller, except as provided in paragraph 17A." Plaintiffs have been forced to hire attorneys to investigate and prosecute this action.  Plaintiffs have been or will be forced to hire consultants/experts to investigate the issues outlined herein.  Plaintiffs have been further damaged as they have had to incur attorney fees and costs in an amount which will be proven at trial.

94.     Plaintiffs reserve the right to seek leave of the Court to amend this complaint to conform to proof and/or add additional allegations upon discovery.

## III.

## THIRD CAUSE OF ACTION

### Breach of Implied Warranties
### (Alleged by Plaintiffs against SUMMIT and DOES 1 - 25)

95.     Plaintiffs reallege and incorporate by reference the foregoing and subsequent paragraphs as though fully set forth herein.

96.     Plaintiffs are informed and believe and thereupon allege that the Property and structure built thereon has been inadequately constructed, developed, designed, supervised, located, and/or otherwise improved such that the structure, and parts thereof, have evidence of damage so that the Property and structure in their present condition, are defective, not of merchantable quality and not fit for the purpose of permitting residents to reside therein and thereon in a normal and usual fashion.

97.   SUMMIT and DOES 1-25, by virtue of their constructing, developing, designing, manufacturing, locating, and building said structures on said Property, impliedly warranted that the subject structure and Property were developed, designed, supervised, tested, planned, constructed, located, and/or improved in a reasonably worker-like manner and would be of merchantable quality and fit for the purpose of use as a high-end, luxury/single-family residence.

98.   Plaintiffs relied upon said warranties and reasonably believed in good faith, that the structure and Property were of merchantable quality, were constructed, developed, designed, manufactured, built, located, and/or improved in a reasonably worker-like manner and were of merchantable quality and were fit for the purpose of being used as a custom home/single-family residence.

99.   Said structure and Property are not of merchantable quality, were not constructed, developed, designed, manufactured, built, located, and/or improved in a worker-like manner, and were not fit for the purpose of being used as single-family residence, but instead, are defective, as is now known, in that the structure and Property has defects including, but not limited to: serious water damage to all interstitial spaces opened up to date; defective drainage; defective waterproofing systems; defective framing; defective foundation systems; defective retaining walls; defective plumbing; defective sprinkler systems; defective drywall; defective heating and air conditioning systems; poor landscaping; defective irrigation installation; defective roofing systems and resultant damages.

100.   Plaintiffs believe and thereupon allege that the structures and Property may be additionally defective in a manner and to an extent presently unknown, but which will be inserted by amendment herein or established at the time of trial.

101.   Plaintiffs are informed and thereupon allege that the above-described Defective Conditions of the structure and Property arose out of, was attributable to, and are directly and proximately caused by, the above-described latent deficiencies in the design, planning, development, manufacturing, supervision, construction, and/or improvement of the subject Property and structure. Prior to the time the Plaintiffs' discovery of the facts set forth herein. Plaintiffs could not reasonably

17
COMPLAINT

have discovered the existence of the above-described defective conditions by the exercise of reasonable diligence.

102.    As a direct and proximate result of the defects set forth herein and the breach of the aforesaid implied warranties by SUMMIT and DOES 1-25, Plaintiffs have suffered in an amount precisely unknown, but in any event, in excess of the Court's minimum jurisdiction amount in costs of repair and/or reconstruction, and loss of value to their residence as a consequence of the Defective Conditions and resultant damage to the Property.  Plaintiffs are presently unaware of the precise amount of damages, but will establish the same at trial according to proof.

103.    As a further direct and proximate result of the defects set forth herein and the breach of the aforesaid implied warranties by SUMMIT and DOES 1-25, Plaintiffs have suffered damages, including, but not limited to: emotional distress damages; personal injuries; medical expenses; loss of consideration paid under the Purchase Agreement; carrying costs of the home; loss of investment capital; costs of repairs and improvements; taxes paid; attorneys' fees; expert costs; mediator costs; escrow and closing costs; depreciation of value of subject residence; and interest, all in an amount in excess of the current jurisdictional limits to be shown according to proof at the time of trial.

104.    Plaintiffs have given Defendants, reasonable notice of the Defective Conditions after they were discovered.

105.    Plaintiffs reserve the right to seek leave of the Court to amend this complaint to conform to proof and/or add additional allegations upon discovery.

IV.

## FOURTH CAUSE OF ACTION

### Breach of Express Warranties
(Alleged by Plaintiffs against SUMMIT and DOES 1 - 25)

106.    As alleged herein, SUMMIT and DOES 1-25, made numerous express warranties to Plaintiffs regarding the construction of the Property, the manner in which it would be performed, the items which would be included, the items which would be provided at an additional cost, and the condition of the finished product. Said warranties were included within the following without

limitation: marketing materials, Purchase Agreement, purchase contracts, plans and specifications, and those representations, as are specifically set forth elsewhere herein.

107.   SUMMIT and DOES 1-25 failed to construct the Property in accordance with the express warranties provided to Plaintiffs.  SUMMIT and DOES 1-25 further failed to honor the express warranties provided to Plaintiffs regarding performing repairs. Defendants neither provided Plaintiffs with a home which conformed with the express warranties in these respects and in others not specifically alleged herein, nor took subsequent steps per the warranties to investigate, repair, and/or otherwise correct the condition of the home.

108.   As a direct and proximate result of the defects set forth herein and the breach of the aforesaid express warranties by SUMMIT and DOES 1-25, Plaintiffs have suffered in an amount precisely unknown, but in any event, in excess of the Court's minimum jurisdiction amount in costs of repair and/or reconstruction, and loss of value to their residence as a consequence of the Defective Conditions and resultant damage to the Property.  Plaintiffs are presently unaware of the precise amount of damages, but will establish the same at trial according to proof.

109.   As a further direct and proximate result of the defects set forth herein and the breach of the aforesaid express warranties by SUMMIT and DOES 1-25, Plaintiffs have suffered damages, including, but not limited to: emotional distress damages; personal injuries; medical expenses; loss of consideration paid under the Purchase Agreement; carrying costs of the home; loss of investment capital; costs of repairs and improvements; taxes paid; attorneys' fees; expert costs; mediator costs; escrow and closing costs; depreciation of value of subject residence; and interest, all in an amount in excess of the current jurisdictional limits to be shown according to proof at the time of trial.

110.   Plaintiffs reserve the right to seek leave of the Court to amend this complaint conform to proof and/or add additional allegations upon discovery.

//
//
//
//
//

## V.

## FIFTH CAUSE OF ACTION

### Negligence - Count One
(Alleged by Plaintiffs against SUMMIT, AULERT, MAIN STREET, ADC, DCC, DCCI, NAYLOR, COAST CONTRACTING, D&D, STEELE PLUMBING, DAWSON, TERRY MERSY, PREMIER, MARK LANGER, DG DESIGN and DOES 1 - 75)

111.    Plaintiffs reallege and incorporate by reference the foregoing and subsequent paragraphs as though fully set forth herein.

112.    SUMMIT, AULERT, MAIN STREET and DOES 1-25, as builders, developers, contractors, managers and/or general contractors, performed works of labor, supplied materials, equipment and services necessary for the construction of the subject Property, including supervision, administration, observation and management of the construction-related activities at the Property and the subject structure with the knowledge that said Property and structure would be used as a high-end, luxury, single-family residence. In doing so, said Defendants in such capacity caused the Property and structure to be constructed through their own works of labor and in supplying of materials, equipment, supervision, administration, observation, management and services.

113.    ADC as professional contractor performed works of labor, supplied materials, equipment and services necessary for the installation of air conditioning units pursuant to their contract.

114.    DCC, DCCI, NAYLOR, COAST CONTRACTING, D&D, STEELE PLUMBING, DAWSON, TERRY MERSY, PREMIER, MARK LANGER, and DOES 26-75 as professional contractors performed works of labor, supplied materials, equipment and services necessary for the completion of the residence located on the subject Property.

115.    DG DESIGN as a draftsman was tasked with the duty to perform drafting services to detail the design and construction specifications for the subject Property.

116.    SUMMIT, AULERT, MAIN STREET and DOES 1-25 were under a duty to exercise ordinary care as a developer, builder, contractor, and/or laborer to avoid reasonable foreseeable injury to users and purchasers of the Property and knew or should have foreseen with reasonable certainty that purchasers and/or users would suffer the monetary damages and health-related ailments set forth

herein if said Defendants failed to perform their duties to cause the Property and structures to be completed in a proper and worker-like manner and fashion. Said Defendants were also under a duty of care in supervision, administration, observation, and management of the construction-related activities at the subject Property.

117. ADC, DCC, DCCI, NAYLOR, COAST CONTRACTING, D&D, STEELE PLUMBING, DAWSON, TERRY MERSY, PREMIER, MARK LANGER and DOES 26-75 were likewise under a duty to exercise ordinary care in the completion of their contract and services to avoid reasonable foreseeable injury to users and purchasers of the Property and knew or should have foreseen with reasonable certainty that purchasers and/or users would suffer the monetary damages and health-related ailments set forth herein if they failed to perform their duties in a proper and worker-like manner and fashion.

118. DG DESIGN was also under a duty to exercise ordinary care in the completion of their contract and services to avoid reasonable foreseeable injury to users and purchasers of the Property and knew or should have foreseen with reasonable certainty that purchasers and/or users would suffer the monetary damages and health-related ailments set forth herein if they failed to perform their duties in a proper and worker-like manner and fashion.

119. In performing the works of a developer, builder, contractor, and/or laborer, SUMMIT, AULERT, MAIN STREET and DOES 1-25 failed and neglected to perform their work, labor, supervision, administration, management and services properly or adequately in that said Defendants negligently, carelessly, and in an unworkmanlike manner, performed the above-described work, labor, supervision, administration, management and/or services such that the subject structures were constructed improperly, negligently, carelessly, and/or in an unworker-like manner. SUMMIT, AULERT, MAIN STREET and DOES 1-25, further negligently, carelessly, and in an unworkmanlike manner permitted unlicensed and/or untrained contractors to construct portions of the subject Property.

120. In performing its work, ADC failed and neglected to perform its work, labor, and services properly or adequately in that ADC negligently, carelessly, and in an unworkmanlike manner, performed its work, labor, and/or services such that the air conditioning units were improperly,

negligently, carelessly, and/or in an unworker-like manner installed in that ADC failed to notice and/or remedy an incomplete condensate line.

121.   In performing their work, DCC, DCCI, NAYLOR, COAST CONTRACTING, D&D, STEELE PLUMBING, DAWSON, TERRY MERSY, PREMIER, MARK LANGER, and DOES 26-75 failed and neglected to perform their work, labor, and services properly or adequately in that they negligently, carelessly, and in an unworkmanlike manner, performed their work, labor, and/or services such that numerous Defective Conditions arose at the subject Property.

122.   In performing its work, DG DESIGN failed and neglected to perform its work, labor, and services properly or adequately in that DG DESIGN negligently, carelessly, and in an unworkmanlike manner, performed its work, labor, and/or services such that the plans, designs, and specifications were, among other things, incorrect, incomplete, lacked the requisite detail and/or not in accordance with the applicable standard in the industry.

123.   As a direct and proximate result of the defects set forth herein and the negligence of Defendants and DOES 1-75, Plaintiffs have suffered in an amount precisely unknown, but in any event, in excess of the Court's minimum jurisdiction amount in costs of repair and/or reconstruction, and loss of value to their residence as a consequence of the Defective Conditions and resultant damage to the Property. Plaintiffs are presently unaware of the precise amount of damages, but will establish the same at trial according to proof.

124.   As a further direct and proximate result of the defects set forth herein and the negligence of Defendants and DOES 1-75, Plaintiffs have suffered damages, including, but not limited to: emotional distress damages; personal injuries; medical expenses; loss of consideration paid under the Purchase Agreement; carrying costs of the home; loss of investment capital; costs of repairs and improvements; taxes paid; attorneys' fees; expert costs; mediator costs; escrow and closing costs; depreciation of value of subject residence; and interest, all in an amount in excess of the current jurisdictional limits to be shown according to proof at the time of trial.

125.   Plaintiffs reserve the right to seek leave of the Court to amend this complaint to conform to proof and/or add additional allegations upon discovery.

//

# VI.

# SIXTH CAUSE OF ACTION

### Negligence Per Se
### (Alleged by Plaintiffs against all Defendants DOES 1 - 75)

126.   Plaintiffs reallege and incorporate by reference the foregoing and subsequent paragraphs as though fully set forth herein.

127.   Plaintiffs are informed and believe and thereupon allege that Defendants DOES 1-75, and each of them, violated statutes, ordinances, and/or regulations when developing the Plaintiffs' Property which statutes, ordinances and/or regulations were designed to prevent the damages herein alleged, including, without limitation: San Diego Municipal Code §145.0101, §145.0102, §145.0103, §145.0104, §145.0105, §145.0106, §145.0107, §145.0201, §145.0202, §145.0203, §145.0204, §145.0205, §145.0206, and §145.0207.

101.   Plaintiffs believe and thereupon allege that the violated statutes, ordinances, and/or regulations were designed to protect the Plaintiffs and similarly situated persons.

102.   Defendants, violations of statutes, ordinance and/or regulations constitutes Negligence Per Se or Negligence as a Matter of Law.

103.   As a direct and proximate result of the defects set forth herein and the negligence of Defendants and DOES 1-75, Plaintiffs have suffered in an amount precisely unknown, but in any event, in excess of the Court's minimum jurisdiction amount in costs of repair and/or reconstruction, and loss of value to their residence as a consequence of the Defective Conditions and resultant damage to the Property. Plaintiffs are presently unaware of the precise amount of damages, but will establish the same at trial according to proof.

128.   As a further direct and proximate result of the defects set forth herein and the negligence of Defendants and DOES 1-75, Plaintiffs have suffered damages, including, but not limited to: emotional distress damages; personal injuries; medical expenses; loss of consideration paid under the Purchase Agreement; carrying costs of the home; loss of investment capital; costs of repairs and improvements; taxes paid; attorneys' fees; expert costs; mediator costs; escrow and closing costs;

depreciation of value of subject residence; and interest, all in an amount in excess of the current

jurisdictional limits to be shown according to proof at the time of trial.

129.   Plaintiffs reserve the right to seek leave of the Court to amend this complaint to

conform to proof and/or add additional allegations upon discovery.

## VII.

## SEVENTH CAUSE OF ACTION

### Fraud or Deceit - Negligent Misrepresentation
(Alleged by Plaintiffs against SUMMIT, AULERT and DOES 1 - 25)

130.   Plaintiffs reallege and incorporate by reference the foregoing and subsequent paragraphs

as though fully set forth herein.

131.   Plaintiffs are informed and believe and thereupon allege that SUMMIT, AULERT and

DOES 1-25 owed Plaintiffs a duty to represent with reasonable accuracy the actual condition, quality

and all facts materially affecting the Property. As the builders, developers, repairers, and sellers of said

Property, said Defendants occupied a special relationship of trust and confidence with Plaintiffs such

that the duty to make accurate and complete representations was incumbent upon Defendants.

132.   Plaintiffs are informed and believe and thereupon allege that SUMMIT, AULERT and

DOES 1-25 in breach of the duties set forth herein negligently misrepresented material facts to

Plaintiffs orally and in writing that subject Property was properly and adequately designed, prepared,

constructed, developed and manufactured.

133.   In or around November and December 2006, SUMMIT, AULERT and DOES 1-25

negligently misrepresented material facts in disclosure statements they completed.  See disclosures

attached hereto as Exhibit "C" and incorporated fully by this reference.

134.   AULERT and DOES 1-25 negligently misrepresented material facts to Plaintiffs on or

about December 4, 2006, when he stated on behalf of SUMMIT on the *Seller Property Questionnaire*,

page one, that he had no knowledge of:

"defect in any of the following, (including past defects that have been repaired)
heating, air conditioning, electrical, plumbing (including the presence of polybutelene
pipes), water, sewer, waste disposal or septic system, sump pumps, roof, gutters,
chimney, fireplace, foundation, crawl space, attic, soil, grading, drainage, retaining
walls, interior or exterior doors, windows, walls, ceilings, floors or appliances"

135.   AULERT and DOES 1-25 further negligently misrepresented material facts to Plaintiffs on or about December 4, 2006, when he stated on behalf of SUMMIT on the *Seller Property Questionnaire*, page two, that he had no knowledge of:

"water intrusion into any part of any physical structure on the Property; leaks from or in any appliance, pipe, slab or roof; standing water, drainage, flooding, underground water, moisture, water-related soil settling or slippage on or affecting the Property" and "Any problem with or infestation of mold, mildew, fungus or spores, past or present, or affecting the Property."

136.   AULERT and DOES 1-25 further negligently misrepresented material facts to Plaintiffs on or about November 17, 2006, when he stated on behalf of SUMMIT on the *Real Estate Transfer Disclosure Statement*, page two, that he had no knowledge of: "Substances, materials, or products which may be an environmental hazard . . ." and that he had no knowledge of "flooding, drainage or grading problems."

137.   The true facts were that the subject Property was defectively constructed and not built in substantial conformance with the applicable plans and specifications and had Defective Conditions that were not adequately and/or appropriately addressed in the engineering, design, construction, investigation and/or repair of the Property.

138.   Plaintiffs are informed and believe and thereon allege that SUMMIT, AULERT and DOES 1-25 had no reasonable grounds for believing the representations were true when they were made, as they were the parties with superior knowledge of the Property.

139.   Plaintiffs are informed and believe and thereon allege that when SUMMIT, AULERT and DOES 1-25 made said representations, such representations were made with intent to induce Plaintiffs to rely on them and act in the manner herein alleged.

140.   Plaintiffs reasonably relied on SUMMIT, AULERT and DOES 1-25's representations as they came from individuals and entities they believed they could trust.

141.   As a direct and proximate result of the negligent misrepresentations of SUMMIT, AULERT and DOES 1-25, Plaintiffs have suffered in an amount precisely unknown, but in any event, in excess of the Court's minimum jurisdiction amount in costs of repair and/or reconstruction, and loss of value to their residence as a consequence of the Defective Conditions and resultant damage at the

1  Property. Plaintiffs are presently unaware of the precise amount of damages, but will establish the

2  same at trial according to proof.

3      142.   As a further direct and proximate result of the negligent misrepresentations of

4  SUMMIT, AULERT and DOES 1-25, Plaintiffs have suffered damages, including, but not limited to:

5  emotional distress damages; personal injuries; medical expenses; loss of consideration paid under the

6  Purchase Agreement; carrying costs of the home; loss of investment capital; costs of repairs and

7  improvements; taxes paid; attorneys' fees; expert costs; mediator costs; escrow and closing costs;

8  depreciation of value of subject residence; and interest, all in an amount in excess of the current

9  jurisdictional limits to be shown according to proof at the time of trial.

10     143.   SUMMIT, AULERT and DOES 1-25's negligent misrepresentations were substantial

11 factors in causing Plaintiffs' harm.

12     144.   Plaintiffs reserve the right to seek leave of the Court to amend this complaint to

13 conform to proof and/or add additional allegations upon discovery.

14                                    **VIII.**

15                        **EIGHTH CAUSE OF ACTION**

16                          **Negligence - Count Two**
   **(Alleged by Plaintiffs against all MILLER and COLDWELL and DOES 76-100)**
17

18     145.   Plaintiffs reallege and incorporate by reference the foregoing and subsequent paragraphs

19 as though fully set forth herein.

20     146.   Defendants MILLER, COLDWELL, and DOES 76-100 served as Plaintiffs' real estate

21 agents with regard to the purchase of the subject Property. As such, they owed a duty of due care to

22 Plaintiffs pursuant to *California Civil Code* § 2079 et seq. to conduct a reasonably competent and

23 visual inspection of the property offered for sale and to disclose to Plaintiffs all facts materially

24 affecting the value or desirability of the property that an investigation would reveal, including but not

25 limited to any Defective Conditions.

26     147.   Plaintiffs are informed and believe and thereupon allege that MILLER, COLDWELL,

27 and DOES 76-100's standard of care is the degree of care that a reasonably prudent real estate licensee

28 would exercise pursuant to *California Civil Code* § 2079 et seq.

148.    Plaintiffs are informed and believe and thereupon allege that MILLER, COLDWELL, and DOES 76-100 failed to act as reasonable careful real estate agents would have acted and breached their duty to Plaintiffs by misrepresenting either intentionally or negligently, and/or concealing material facts regarding the manner of construction and the true conditions existing at the subject Property at the time of sale, as more fully set forth herein above, thereby causing Plaintiffs damage.

149.    As a direct and proximate result of the defects set forth herein and the negligence of MILLER, COLDWELL, and DOES 76-100, Plaintiffs have suffered in an amount precisely unknown, but in any event, in excess of the Court's minimum jurisdiction amount in costs of repair and/or reconstruction, and loss of value to their residence as a consequence of the Defective Conditions and resultant damage to the Property. Plaintiffs are presently unaware of the precise amount of damages, but will establish the same at trial according to proof.

150.    As a further direct and proximate result of the defects set forth herein and the negligence of MILLER, COLDWELL, and DOES 76-100.  Plaintiffs have suffered damages, including, but not limited to: emotional distress damages; personal injuries; medical expenses; loss of consideration paid under the Purchase Agreement; carrying costs of the home; loss of investment capital; costs of repairs and improvements; taxes paid; attorneys' fees; expert costs; mediator costs; escrow and closing costs; depreciation of value of subject residence; and interest, all in an amount in excess of the current jurisdictional limits to be shown according to proof at the time of trial.

151.    Plaintiffs reserve the right to seek leave of the Court to amend this complaint to conform to proof and/or add additional allegations upon discovery.

## IX.

## NINTH CAUSE OF ACTION

### Breach of Fiduciary Duty
### (Alleged by Plaintiffs against all MILLER, COLDWELL and DOES 76-100)

152.    Plaintiffs reallege and incorporate by reference the foregoing and subsequent paragraphs as though fully set forth herein.

153.    Defendants MILLER, COLDWELL, and DOES 76-100 served as Plaintiffs' real estate agents with regard to the purchase of the subject property. As such, they were in a fiduciary

relationship with Plaintiffs pursuant to *California Civil Code* § 2079.24. Said section also includes a duty of disclosure.

154. In fact MILLER, COLDWELL, and DOES 76-100 served as "dual agents," for the parties whereby the law imposed additional duties.

155. Plaintiffs are informed and believe and thereupon allege that MILLER, COLDWELL, and DOES 76-100's fiduciary duty to Plaintiffs required MILLER, COLDWELL, and DOES 76-100 to disclose all material information in their possession.

156. Plaintiffs are informed and believe and thereupon allege MILLER, COLDWELL, and DOES 76-100 failed to act as reasonable careful real estate agents would have acted and breached their duty to Plaintiffs by misrepresenting either intentionally or negligently, and/or concealing the manner of construction and the true conditions existing at the subject Property at the time of sale, as more fully set forth herein above, thereby causing Plaintiff damage.

157. Plaintiffs are informed and believe and thereupon allege MILLER, COLDWELL, and DOES 76-100's actions amounted to constructive fraud and/or negligent non-disclosure.

158. As a direct and proximate result of the defects set forth herein and the breach of fiduciary duty of MILLER, COLDWELL, and DOES 76-100, Plaintiffs have suffered in an amount precisely unknown, but in any event, in excess of the Court's minimum jurisdiction amount in costs of repair and/or reconstruction, and loss of value to their residence as a consequence of the Defective Conditions and resultant damage to the Property. Plaintiffs are presently unaware of the precise amount of damages, but will establish the same at trial according to proof.

159. As a further direct and proximate result of the defects set forth herein and the breach of fiduciary duty of MILLER, COLDWELL, and DOES 76-100, Plaintiffs have suffered damages, including, but not limited to: emotional distress damages; personal injuries; medical expenses; loss of consideration paid under the Purchase Agreement; carrying costs of the home; loss of investment capital; costs of repairs and improvements; taxes paid; attorneys' fees; expert costs; mediator costs; escrow and closing costs; depreciation of value of subject residence; and interest, all in an amount in excess of the current jurisdictional limits to be shown according to proof at the time of trial.

160.    Plaintiffs reserve the right to seek leave of the Court to amend this complaint to conform to proof and/or add additional allegations upon discovery.

## PRAYER

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1.    General damages in an amount not currently known but in excess of the minimum jurisdiction of this court, the amount which will be shown according to proof at the time of trial;

2.    Consequential damages in an amount not currently known but in excess of the minimum jurisdiction of this court, the amount which will be shown according to proof at the time of trial;

3.    Special damages according to proof at the time of trial in an amount not currently known but in excess of the minimum jurisdiction of this court, the amount which will be shown according to proof at the time of trial;

4.    Emotional distress damages in an amount not currently known but in excess of the minimum jurisdiction of this court, the amount which will be shown according to proof at the time of trial;

5.    For attorneys' fees;

6.    Investigative costs, repair costs, and improvements;

7.    Interest pursuant to *California Civil Code* § 3287 and all other interest allowable under the law;

8.    For costs of suit incurred herein; and

9.    For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs requests trial by jury on all claims so triable.

DATED: September 23, 2008          QUADE & ASSOCIATES, a PLC


By: _____
     Michael W. Quade
     Cheryl L. Gustafson
     Attorneys for Plaintiffs

# EXHIBIT E



## LEGAL SERVICES AGREEMENT

### RECITALS

A.   Stephen and Tova Stein, individually and as trustees for the Stein Family Trust (hereinafter referred to as "Steins") and NAYLOR CONSTRUCTION, INC., CHRISTIAN NAYLOR, individually and dba NAYLOR CONSTRUCTION,(hereinafter collectively referred to as "Naylor") need specialized legal advice concerning Naylor's claim against the parties responsible for damages sustained by Naylor as a result of the acts and/or omissions of NIC Insurance Company, Gemini Insurance Company, Lincoln General Insurance and possibly others as future investigation may indicate arising out of a wrongful denial of coverage, failure to respond to tender, or related acts/omissions for insurance coverage for work performed at 1316 Summit Ave, Cardiff, California. The Steins and Naylor are sometimes collectively referred to in this agreement as CLIENTS.

B.   Steins and Naylor have entered into a Stipulated Judgment and Assignment of Proceeds of Action In Exchange for Covenant Not to Execute (hereinafter "Assignment"), the terms and conditions of which are incorporated herein by this reference and attached hereto as Exhibit "A".

C.   CLIENTS wish to retain QUADE & ASSOCIATES, a PLC ("Attorney") to prosecute their claim against the parties responsible for damages sustained by CLIENTS as a result of the wrongful acts of NIC Insurance Company, Gemini Insurance Company, Lincoln General Insurance and possibly others as future investigation may indicate.

NOW THEREFORE, the parties agree as follows:

1.   <u>Scope of Services.</u>

CLIENTS retain Attorney to represent CLIENTS in connection with the damages sustained by CLIENTS described above.  Attorney agrees to perform the following legal services, if necessary, with respect to the CLIENTS' damages claim:  (a) investigation of available claims; (b) determination of the identity of parties responsible for the injuries and/or damages; (c) preparation and filing of lawsuits or arbitration demands as appropriate;  (d) settlement procedures and negotiations; (e) prosecution of claims by arbitration or legal action until award or judgment is obtained; (f) if judgment is obtained in CLIENTS' favor, opposing a motion for new trial by an opposing party; (g) in defense of any lawsuit, cross-complaint or other cross-demand filed against CLIENTS in connection with the damage claim; and (h) judgment enforcement proceedings. This Agreement does not cover other related claims that may arise and may require legal services. If such matters arise, separate agreements for legal services will be required if CLIENTS wish Attorney to handle such matters.



//

//


CLIENTS Initial
CLIENTS Initial
CLIENTS Initial _____

LEGAL SERVICES AGREEMENT

RECITALS

A.     Stephen and Tova Stein, individually and as trustees for the Stein Family Trust (hereinafter referred to as "Steins") and NAYLOR CONSTRUCTION, INC., CHRISTIAN NAYLOR, individually and dba NAYLOR CONSTRUCTION, (hereinafter collectively referred to as "Naylor") need specialized legal advice concerning Naylor's claim against the parties responsible for damages sustained by Naylor as a result of the acts and/or omissions of NIC Insurance Company, Gemini Insurance Company, Lincoln General Insurance and possibly others as future investigation may indicate arising out of a wrongful denial of coverage, failure to respond to tender, or related acts/omissions for insurance coverage for work performed at 1316 Summit Ave, Cardiff, California. The Steins and Naylor are sometimes collectively referred to in this agreement as CLIENTS.

B.     Steins and Naylor have entered into a Stipulated Judgment and Assignment of Proceeds of Action in Exchange for Covenant Not to Execute (hereinafter "Assignment"), the terms and conditions of which are incorporated herein by this reference and attached hereto as Exhibit "A".

C.     CLIENTS wish to retain QUADE & ASSOCIATES, a PLC ("Attorney") to prosecute their claim against the parties responsible for damages sustained by CLIENTS as a result of the wrongful acts of NIC Insurance Company, Gemini Insurance Company, Lincoln General Insurance and possibly others as future investigation may indicate.

NOW THEREFORE, the parties agree as follows:

1.     Scope of Services.

CLIENTS retain Attorney to represent CLIENTS in connection with the damages sustained by CLIENTS described above. Attorney agrees to perform the following legal services, if necessary, with respect to the CLIENTS' damages claim: (a) investigation of available claims; (b) determination of the identity of parties responsible for the injuries and/or damages; (c) preparation and filing of lawsuits or arbitration demands as appropriate; (d) settlement procedures and negotiations; (e) prosecution of claims by arbitration or legal action until award or judgment is obtained; (f) if judgment is obtained in CLIENTS' favor, opposing a motion for new trial by an opposing party; (g) defense of any lawsuit, cross-complaint or other cross demand filed against CLIENTS in connection with the damage claim; and (h) judgment enforcement proceedings. This Agreement does not cover other related claims that may arise and may require legal services. If such matters arise, separate agreements for legal services will be required if CLIENTS wish Attorney to handle such matters.

//

//

CLIENTS Initial _____
CLIENTS Initial _____
CLIENTS Initial _____

Page 1 of 9

FROM :stein                     FAX NO. :7602302327        Aug. 30 2011 11:33AM  P2

2.      **Services Not Covered by this Agreement.**

_____ If additional services are necessary in connection with the damages claim, and CLIENTS request Attorney to perform such services, additional fee arrangements shall be made between Attorney and CLIENTS.  Such additional services may be required, for example:

(a)     If the judgment obtained on the damage claim is not in CLIENTS' favor, or the amount of any judgment thereof is unsatisfactory to CLIENTS and CLIENTS determine that an appeal is necessary;

(b)     If the judgment obtained on the damage claim is in CLIENTS' favor, and an opposing party appeals from the judgment; or

The fees for such additional services will be charged separately by Attorney at its standard hourly rates applicable at the time of the performance of the services.

3.      **Compensation.**

In consideration of the legal services to be rendered by Attorney under this Agreement, CLIENTS agree to pay Attorney fees to Attorney on the following basis:

(a)     Attorney shall only be compensated for legal services rendered if a recovery is obtained for CLIENTS.  If no recovery is obtained, Naylor is only responsible for $1,500.00 of costs and litigation expenses as set forth in paragraph (d) below.

(b)     As Attorney's fees, CLIENTS agree to pay Attorney an amount equal to FIFTY percent (50%) of the gross recovery, including any award of punitive damages, reached by compromise, settlement, judgment, arbitration award or otherwise.  In the case of a judgment, gross recovery – as that term is used herein – is defined to include any award or allocation of *Brandt* fees and costs, plus any damages awarded.

Should the Attorney elect, CLIENTS agree to have Attorney's compensation for legal fees be the sum awarded by a court or arbitrator as noted in paragraph four (4) below as opposed to Attorney rate stated in this paragraph.

(c)     Attorney will incur various costs and litigation expenses in performing the legal services under this Agreement. Except for the $1,500.00 to be paid by Naylor pursuant to paragraph 3(d), Attorney will advance all costs and litigation expenses.  Attorney shall first be reimbursed out of any recovery for said costs and litigation expenses before any distribution of fees and before any distribution to CLIENTS.  If no recovery is obtained or recovery is insufficient to cover the costs and litigation expenses, CLIENTS shall not be responsible for any costs and litigation expenses beyond those amounts reimbursed to Attorney from the recovery. CLIENTS may not

CLIENTS Initial _____
CLIENTS Initial _____
CLIENTS Initial _____

2.   Services Not Covered by this Agreement.

If additional services are necessary in connection with the damages claim, and CLIENTS request Attorney to perform such services, additional fee arrangements shall be made between Attorney and CLIENTS. Such additional services may be required, for example:

(a)   If the judgment obtained on the damage claim is not in CLIENTS' favor, or the amount of any judgment thereof is unsatisfactory to CLIENTS and CLIENTS determine that no appeal is necessary;

(b)   If the judgment obtained on the damage claim is in CLIENTS' favor, and an opposing party appeals from the judgment; or

The fees for such additional services will be charged separately by Attorney at its standard hourly rates applicable at the time of the performance of the services.

3.   Compensation.

In consideration of the legal services to be rendered by Attorney under this Agreement, CLIENTS agree to pay Attorney fees to Attorney on the following basis:

(a)   Attorney shall only be compensated for legal services rendered if a recovery is obtained for CLIENTS. If no recovery is obtained, Naylor is only responsible for $1,500.00 of costs and litigation expenses as set forth in paragraph (d) below.

(b)   As Attorney's fees, CLIENTS agree to pay Attorney an amount equal to FIFTY percent (50%) of the gross recovery, including any award of punitive damages, reached by compromise, settlement, judgment, arbitration award or otherwise. In the case of a judgment, gross recovery — as that term is used herein — is defined to include any award or allocation of *Brandt* fees and costs, plus any damages awarded.

Should the Attorney elect, CLIENTS agree to have Attorney's compensation for legal fees be the sum awarded by a court or arbitrator as noted in paragraph four (4) below as opposed to Attorney rate stated in this paragraph.

(c)   Attorney will incur various costs and litigation expenses in performing the legal services under this Agreement. Except for the $1,500.00 to be paid by Naylor pursuant to paragraph 3(d), Attorney will advance all costs and litigation expenses. Attorney shall first be reimbursed out of any recovery for said costs and litigation expenses before any distribution of fees and before any distribution to CLIENTS. If no recovery is obtained or recovery is insufficient to cover the costs and litigation expenses, CLIENTS shall not be responsible for any costs and litigation expenses beyond those amounts reimbursed to Attorney from the recovery. CLIENTS may not

CLIENTS Initial _____
CLIENTS Initial _____
CLIENTS Initial _____

recover any sums in this litigation should recovery be insufficient to cover costs, litigation expenses and Attorney fees.

Costs, disbursements and litigation expenses commonly include court filing fees, process serving fees, court reporter fees, deposition transcript fees, jury fees, subpoena fees, witness fees, consultant fees, expert witness fees, investigative and testing fees, litigation support fees (e.g., videographer, photographer, graphic artist and exhibit preparation services), long distance telephone charges, fax charges, postage, Federal Express and other overnight delivery service charges, photocopy charges, messenger fees, travel expenses (e.g., transportation, air fare, rental car, parking, mileage, meals, lodging and all other costs of necessary out-of-town travel), professional mediator fees, arbitrator fees, and other similar items. Except as provided in paragraph 3(e) below, CLIENTS grant Attorney authority to incur such costs and litigation expenses as Attorney deems advisable to prosecute the claim.

Except for the items listed below, costs and expenses will be charged at Attorney's cost.

| | |
|---|---|
| In office photocopying | 20 cents per page |
| Facsimile charges | 35 cents per page |
| Scanning | 25 cents per page |
| Mileage /mile: | Current rate set by the IRS |
| Color photo-copying | 1.25 cents per page |

(d)     With respect to the costs noted in paragraph 3(c), above, immediately following execution of this Retainer Agreement, Naylor will tender a cost retainer in the sum of $1,500.00. Initial costs and expenses will be billed against this retainer. Naylor's $1,500.00 costs retainer is irrespective of the $1,000.00 payment due within 15 days of the Court's grant of Good Faith noted in paragraph one (1) of the Assignment.

(e)     Attorney is not authorized to incur an individual item of cost or litigation expense (as described in paragraph 3(c)) exceeding $5,000.00 without the prior authorization of CLIENTS. Consent by the CLIENTS shall not be unreasonably withheld.

(f)     In addition, CLIENTS acknowledge and agree that it will be necessary for Attorney to retain consultants and/or experts to investigate and to prosecute CLIENTS's claim against the parties responsible for the damages sustained. Employment of investigators, consultants and/or expert witnesses will be at Attorney's discretion, subject to the limitations of paragraph 3(e), and will report to Attorney only. Attorney reserves the right to employ associate counsel at Attorney's expense.

(g)     After Attorney is reimbursed for costs and litigation expenses advanced in prosecution of the action, Attorney fees will be paid thereafter. The Steins shall then receive 66 2/3% of the remaining monies and Naylor shall receive 33 1/3% of the remaining monies.



CLIENTS Initial

CLIENTS Initial

CLIENTS Initial

recovery of any sums in this litigation should recovery be insufficient to cover costs, litigation expenses and Attorney fees.

Costs, disbursements and litigation expenses commonly include court filing fees, process serving fees, court reporter fees, deposition transcript fees, jury fees, subpoena fees, witness fees, consultant fees, expert witness fees, investigative and testing fees, litigation support fees (e.g., videographer, photographer, graphic artist and exhibit preparation services), long distance telephone charges, fax charges, postage, Federal Express and other overnight delivery service charges, photocopy charges, messenger fees, travel expenses (e.g., transportation, air fare, rental car, parking, mileage, meals, lodging and all other costs of necessary out-of-town travel), professional mediator fees, arbitrator fees, and other similar items. Except as provided in paragraph 3(e) below, CLIENTS grant Attorney authority to incur such costs and litigation expenses as Attorney deems advisable to prosecute the claim.

Except for the items listed below, costs and expenses will be charged at Attorney's cost.

| | |
|---|---|
| In-office photocopying | 20 cents per page |
| Facsimile charges | 35 cents per page |
| Scanning | 25 cents per page |
| Mileage /mile: | Current rate set by the IRS |
| Color photo-copying | 1.25 cents per page |

(d)    With respect to the costs noted in paragraph 3(c), above, immediately following execution of this Retainer Agreement, Naylor will tender a cost retainer in the sum of $1,000.00. Initial costs and expenses will be billed against this retainer. Naylor's $1,000.00 costs retainer is irrespective of the $1,000.00 payment due within 15 days of the Court's grant of Good Faith noted in paragraph one (1) of the Assignment.

(e)    Attorney is not authorized to incur an individual item of cost or litigation expense (as described in paragraph 3(c)) exceeding $5,000.00 without the prior authorization of CLIENTS. Consent by the CLIENTS shall not be unreasonably withheld.

(f)    In addition, CLIENTS acknowledge and agree that it will be necessary for Attorney to retain consultants and/or experts to investigate and to prosecute CLIENTS's claim against the parties responsible for the damages sustained. Employment of investigators, consultants and/or expert witnesses will be at Attorney's discretion, subject to the limitations of paragraph 3(e), and will report to Attorney only.   Attorney reserves the right to employ associate counsel at Attorney's expense.

(g)    After Attorney is reimbursed for costs and litigation expenses advanced in prosecution of the action, Attorney fees will be paid thereafter. The firm shall then receive one 2/3% of the remaining monies and Naylor shall receive 33 1/3% of the remaining monies.

CLIENTS Initial _____
CLIENTS Initial _____
CLIENTS Initial _____

Example: How fees and costs are to be calculated in a hypothetical situation assuming a settlement of One Hundred Thousand ($100,000.00) is reached: Assuming costs and expenses in this hypothetical to be reimbursed to attorney are $15,000.00 and Attorney fees are $50,000.00 (50% of $100,000.00), then, the balance settlement payout would be in the sum of $35,000.00. This sum is then distributed pursuant to the Assignment of Proceeds of Action in Exchange for Covenant Not to Execute, attached hereto as Exhibit "A", wherein CLIENT Naylor would receive 33 1/3 % of the net recovery ($11,666.66) and Steins 66 2/3% of the net recovery ($23,333.33). This paragraph is provided only by way of example and does not intend to make any guarantees or representations with regard to the actual amount of recovery or costs and expenses to be incurred in the instant matter.

    4.    **Recoverable Attorney Fees and Expenses.**

    CLIENTS understand that a party to litigation normally may not recover Attorney fees and expenses, but in some limited circumstances they are recoverable by the prevailing party. If CLIENTS prevail in the instant action and receive any award for Attorney fees or expenses, CLIENTS understand that the award will not replace this Agreement so as to limit Attorney's fee or CLIENTS' responsibilities. However, at the election of Attorney, any Attorney fees awarded by the court or arbitrator, pursuant to statute or contract, in connection with the subject matter of this representation, may be chosen as the form of payment to Attorney instead of the Attorney rates outlined in paragraph 3(b) above. Any fees submitted to a court or arbitrator shall be submitted at Attorney's current hourly rate. Attorney's current hourly rate is $400.00/hour for Attorneys, $350.00 an hour for associate Attorneys, and $180.00/hour for paralegals and law clerks. The Court may also in its discretion award an hourly rate in excess of these amounts known as a "lodestar." CLIENTS' initials below indicates that they have read, understood and agree to section 4 of this Agreement.

    5.    **Cost Review.**

    CLIENTS acknowledges that estimating future costs and litigation expenses (as described in paragraph 3(e)) are speculative and difficult to calculate; however, Attorney shall endeavor to provide estimates of such anticipated costs and litigation expenses as requested by CLIENTS.

    6.    **Monthly Billing/Summary Statements.**

    Immediately following execution of this Retainer Agreement, Naylor will tender a cost retainer in the sum of $1,500.00. Initial costs and expenses will be billed against this retainer. Attorney will send CLIENTS monthly billing/summary statements for costs, disbursements and expenses incurred in connection with this matter. Such billings/summaries will be sent via electronic format only in order to contain costs. CLIENTS will keep Attorney informed of email address at all times.

CLIENTS Initial _____
CLIENTS Initial _____
CLIENTS Initial _____

Example: How fees and costs are to be calculated in a hypothetical situation assuming a settlement of One Hundred Thousand ($100,000.00) is reached. Assuming costs and expenses in this hypothetical to be reimbursed to attorney are $45,000.00 and Attorney fees are $50,000.00 (50% of $100,000.00), then, the balance settlement payout would be in the sum of $35,000.00. This sum is then distributed pursuant to the Assignment of Proceeds of Action in Exchange for Covenant Not to Execute, attached hereto as Exhibit "A", wherein CLIENT Naylor would receive 33 1/3 % of the net recovery ($11,666.66) and Strius 66 2/3% of the net recovery ($23,333.33). This paragraph is provided only by way of example and does not intend to make any premature representations with regard to the actual amount of recovery or costs and expenses to be incurred in the instant matter.

4. **Recoverable Attorney Fees and Expenses.**

CLIENTS understand that a party to litigation normally may not recover Attorney fees and expenses, but in some limited circumstances they are recoverable by the prevailing party. If CLIENTS prevail in the instant action and receive any award for Attorney fees or expenses, CLIENTS understand that the award will not replace this Agreement so as to limit Attorney's fee or CLIENTS' responsibilities. However, at the election of Attorney, any Attorney fees awarded by the court or arbitrator, pursuant to statute or contract, in connection with the subject matter of this representation, may be chosen as the form of payment to Attorney instead of the Attorney rates outlined in paragraph 3(b) above. Any fees submitted to a court or arbitrator shall be submitted at Attorney's current hourly rate. Attorney's current hourly rate is $400.00/hour for Attorneys; $350.00 an hour for associate Attorneys; and $180.00/hour for paralegals and law clerks. The Court may also in its discretion award an hourly rate in excess of these amounts known as a "lodestar." CLIENTS initials below indicates that they have read, understood and agree to section 4 of this Agreement.

5. **Cost Review.**

CLIENTS acknowledges that estimating future costs and litigation expenses (as described in paragraph 3(e)) are speculative and difficult to calculate; however, Attorney shall endeavor to provide estimates of such anticipated costs and litigation expenses as requested by CLIENTS.

6. **Monthly Billing/Summary Statements.**

Immediately following execution of this Retainer Agreement, Naylor will tender a cost retainer in the sum of $1,500.00. Initial costs and expenses will be billed against this retainer. Attorney will send CLIENTS monthly billing/summary statements for costs, disbursements and expenses incurred in connection with this matter. Such billings/summaries will be sent via electronic format only in order to contain costs. CLIENTS will keep Attorney informed of email address at all times.

CLIENTS Initial _____

CLIENTS Initial _____

CLIENTS Initial _____

Page 1 of 9

7.     **Interest Charges.**

Attorney is entitled to interest on cost and litigation expenses advanced by Attorney. Interest will be calculated by multiplying the amount paid by Attorney by the periodic rate of .833% per month (TEN PERCENT [10%] ANNUAL PERCENTAGE RATE). The advanced amounts will bear interest until the date of reimbursement.

8.     **Termination.**

CLIENTS shall have the right to terminate this Agreement without cause on 24 hours written notice delivered to Attorney. If Naylor decides to terminate Attorney, Naylor shall be solely responsible for reimbursement to attorney of costs, litigation expenses, and reasonable attorney fees. If the Steins decide to terminate Attorney, the Steins shall be solely responsible for reimbursement to attorney of costs, litigation expenses, and reasonable attorney fees. If Naylor and the Steins jointly decide to terminate Attorney, they shall jointly be responsible for reimbursement to attorney of costs, litigation expenses, and reasonable attorney fees.

Attorney may withdraw as counsel for CLIENTS for good cause. "Good cause" shall include, without limitation, those circumstances outlined in California State Bar Rule of Professional Responsibility 3-700, which includes, but is not limited to circumstances where CLIENT(S): (a) insists upon presenting a claim or defense that is not warranted under existing law and cannot be supported by good faith argument for an extension, modification, or reversal of existing law, or (b) seeks to pursue an illegal course of conduct, or (c) insists that the member pursue a course of conduct that is illegal or that is prohibited under these rules or the State Bar Act, or (d) by other conduct renders it unreasonably difficult for the member to carry out the employment effectively, or (e) insists, in a matter not pending before a tribunal, that the member engage in conduct that is contrary to the judgment and advice of the member but not prohibited under these rules or the State Bar Act, or (f) breaches an agreement or obligation to the member as to expenses or fees. (A copy of the complete language of Rule 3-700 is attached hereto as Exhibit "B" and incorporated fully by this reference.) If withdrawal is due to the acts/omissions of Naylor, Naylor shall be solely responsible for reimbursement to attorney of costs, litigation expenses, and reasonable attorney fees. If withdrawal is due to the acts/omissions of the Steins, the Steins shall be solely responsible for reimbursement to attorney of costs, litigation expenses, and reasonable attorney fees. If withdrawal is due to the acts/omissions of both Naylor and the Steins, they shall jointly be responsible for reimbursement to attorney of costs, litigation expenses, and reasonable attorney fees.

9.     **Settlement.**

Attorney will not make any settlement or compromise of any nature of the damage claim without CLIENTS' prior approval. CLIENTS retain the absolute right to accept or reject any settlement. CLIENTS agree to seriously consider any settlement offer Attorney recommends before making a decision to accept or reject such offer. CLIENTS agree not to make any settlement or compromise of any nature of the injury and/or damage claim without prior notice to Attorney.

CLIENTS Initial
CLIENTS Initial
CLIENTS Initial

7.   **Interest Charges.**

Attorney is entitled to interest on cost and litigation expenses advanced by Attorney. Interest will be calculated by multiplying the amount paid by Attorney by the periodic rate of .833% per month (TEN PERCENT (10%) ANNUAL PERCENTAGE RATE). The advanced amounts will bear interest until the date of reimbursement.

8.   **Termination.**

CLIENTS shall have the right to terminate this Agreement without cause on 24 hours written notice delivered to Attorney. If Naylor decides to terminate Attorney, Naylor shall be solely responsible for reimbursement to attorney of costs, litigation expenses, and reasonable attorney fees. If the Steins decide to terminate Attorney, the Steins shall be solely responsible for reimbursement to attorney of costs, litigation expenses, and reasonable attorney fees. If Naylor and the Steins jointly decide to terminate Attorney, they shall jointly be responsible for reimbursement to attorney of costs, litigation expenses, and reasonable attorney fees.

Attorney may withdraw as counsel for CLIENTS for good cause. "Good cause" shall include, without limitation, those circumstances outlined in California State Bar Rule of Professional Responsibility 3-700, which includes, but is not limited to circumstances where CLIENTS: (a) insists upon presenting a claim or defense that is not warranted under existing law and cannot be supported by good faith argument for an extension, modification, or reversal of existing law, or (b) seeks to pursue an illegal course of conduct, or (c) insists that the member pursue a course of conduct that is illegal or that is prohibited under these rules of the State Bar Act, or (d) by other conduct renders it unreasonably difficult for the member to carry out the employment effectively, or (e) insists, in a matter not pending before a tribunal, that the member engage in conduct that is contrary to the judgment and advice of the member but not prohibited under these rules of the State Bar Act, or (f) breaches an agreement or obligation to the member as to expenses or fees. (A copy of the complete language of Rule 3-700 is attached hereto as Exhibit "D" and incorporated fully by this reference.) If withdrawal is due to the acts/omissions of Naylor, Naylor shall be solely responsible for reimbursement to attorney of costs, litigation expenses, and reasonable attorney fees. If withdrawal is due to the acts/omissions of the Steins, the Steins shall be solely responsible for reimbursement to attorney of costs, litigation expenses, and reasonable attorney fees. If withdrawal is due to the acts/omissions of both Naylor and the Steins, they shall jointly be responsible for reimbursement to attorney of costs, litigation expenses, and reasonable attorney fees.

9.   **Settlement.**

Attorney will not make any settlement or compromise of any nature of the damage claim without CLIENTS' prior approval. CLIENTS retain the absolute right to accept or reject any settlement. CLIENTS agree to seriously consider any settlement offer Attorney recommends before making a decision to accept or reject such offer. CLIENTS agree not to make any settlement or compromise of any nature of the injury and/or damage claim without prior notice to Attorney.

CLIENTS initial _____
CLIENTS initial _____
CLIENTS initial _____

10. **Attorney's Lien.**

To secure payment to Attorney of all sums due under this Agreement for services rendered and costs advanced, CLIENTS hereby grant to Attorney a lien on the damage claim and any causes of action or lawsuits filed thereon, and to any recovery CLIENTS may obtain, whether by settlement, judgment or otherwise in satisfaction or partial satisfaction of the injury and/or damage claim. Upon such recovery and at the request of Attorney, CLIENTS shall execute documents which reflect Attorney's security interest.

11. **No Guaranty of Success.**

CLIENTS understand that no particular result or amount of compensation can be guaranteed or promised by Attorney. CLIENTS agree to provide promptly all information requested by Attorney and to cooperate fully in presenting any claim or suit.

12. **Independent Counsel.**

CLIENTS acknowledge that they have the right to have this Agreement reviewed by independent counsel.

13. **Applicable Law.**

The parties agree that this Agreement has been entered into in the State of California, and shall be governed by, and construed and enforced in accordance with, the laws of the State of California. The law of the State of California shall govern the validity of this Agreement.

14. **Execution of Agreement.**

The parties agree that this Agreement may be signed in counterparts and that it shall be fully executed when signed by the parties whether the signatures of the parties appear on the original or one or more copies of this Agreement. The parties further agree that this Agreement shall be fully executed when each party is in receipt of the original or facsimile signature of the other party. The parties further agree that original signatures of each party on this Agreement are not necessary to enforce this Agreement.

15. **Negotiable/Statutory Fee Agreement.**

It is understood that the fee provided for in this Agreement is not set by law but is negotiable between Attorney and CLIENTS, and CLIENTS have been so advised and consent to this Agreement.



10.    Attorney's Lien

To secure payment to Attorney of all sums due under this Agreement for services rendered and costs advanced, CLIENTS hereby grant to Attorney a lien on the damage claim and any causes of action or lawsuits filed thereon, and to any recovery CLIENTS may obtain, whether by settlement, judgment or otherwise in satisfaction or partial satisfaction of the injury and/or damage claim. Upon such recovery and at the request of Attorney, CLIENTS shall execute documents which reflect Attorney's security interest.

11.    No Guaranty of Success.

CLIENTS understand that no particular result or amount of compensation can be guaranteed or promised by Attorney. CLIENTS agree to provide promptly all information requested by Attorney and to cooperate fully in presenting any claim or suit.

12.    Independent Counsel.

CLIENTS acknowledge that they have the right to have this Agreement reviewed by independent counsel.

13.    Applicable Law.

The parties agree that this Agreement has been entered into in the State of California, and shall be governed by, and construed and enforced in accordance with, the laws of the State of California. The law of the State of California shall govern the validity of this Agreement.

14.    Execution of Agreement.

The parties agree that this Agreement may be signed in counterparts and that it shall be fully executed when signed by the parties whether the signatures of the parties appear on the original or one or more copies of this Agreement. The parties further agree that this Agreement shall be fully executed when each party is in receipt of the original or facsimile signature of the other party. The parties further agree that original signatures of each party on this Agreement are not necessary to enforce this Agreement.

15.    Negotiable/Statutory Fee Agreement.

It is understood that the fee provided for in this Agreement is not set by law but is negotiable between Attorney and CLIENTS, and CLIENTS have been so advised and consent to this Agreement.

CLIENTS initial
CLIENTS initial
CLIENTS initial

16.   **Monetary Sanctions.**

CLIENTS understand that during the course of litigation or arbitration, the parties will seek to gather information about the case by means of taking depositions, by asking formal questions called interrogatories, by sending requests for production of documents and so forth. CLIENTS understand that oftentimes the parties disagree as to what is properly discoverable and that motions are sometimes necessary to determine whether something is properly subject to discovery. CLIENTS understand that in connection with such motions a court or arbitrator may impose sanctions upon the party or the party's Attorney for improperly seeking or resisting discovery. CLIENTS understand that the advice that Attorney may provide CLIENTS concerning discovery is confidential and CLIENTS agree not to disclose it to the court or arbitrator. CLIENTS further understand that Attorney's efforts in participating or resisting discovery will be designed and intended to further CLIENTS' interests, consistent with Attorney's ethical and professional obligations. Consequently, in the event that sanctions are imposed in the course of representing CLIENTS' interests, Attorney will not be responsible for the payment of such sanctions, unless otherwise directed by the court or arbitrator imposing the sanctions. That is, if monetary sanctions are specifically imposed against Attorney, then Attorney shall be responsible for payment of such sanctions. If sanctions are due to the acts/omissions of Naylor, Naylor shall be solely responsible for same. If sanctions are due to the acts/omissions of the Steins, the Steins shall be solely responsible for same. If sanctions are due to the acts/omissions of both Naylor and the Steins, they shall jointly be responsible for same. Subject to the foregoing, the responsible CLIENTS shall have the obligation of paying any sanctions imposed. Attorney will advance any CLIENT sanctions and interest will accrue on the advanced sums. Sanctions advanced will be deducted from any recovery obtained after reimbursement to Attorney for costs and litigation expenses, and after payment of Attorney's fees. If there is no recovery or recovery is insufficient to pay the sanctions after reimbursement of costs and litigation expenses and after payment of Attorney's fees, the responsible CLIENTS will ultimately be responsible for the remaining portion of sanctions due to be reimbursed to Attorney.

17.   **Insurance Disclosure.**

Attorney maintains errors and omissions (malpractice) insurance coverage.

18.   **CLIENTS' Receipt of Agreement and Knowledge of Terms.**

CLIENTS acknowledge that they have read and fully understand all of the terms and conditions of this Agreement before signing it, and have received a copy of this Agreement upon execution thereof.

19.   **BINDING ARBITRATION PROVISION.**

ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY CLAIMS FOR LEGAL MALPRACTICE, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, AND/OR

CLIENTS Initial
CLIENTS Initial
CLIENTS Initial

16. [illegible]

[illegible]

17. Insurance disclosure.

[illegible]

18. CLIENTS' Receipt of Agreement and Knowledge of Terms

[illegible]

19. BINDING ARBITRATION PROVISION

ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY CLAIMS FOR LEGAL MALPRACTICE, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, AND/OR

OTHER CLAIMS RELATING TO THE PROVISION OF PROFESSIONAL SERVICES, SHALL BE SETTLED BY BINDING ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION IN ACCORDANCE WITH ITS APPLICABLE RULES. BY AGREEING TO SUBMIT THIS MATTER TO BINDING ARBITRATION, YOU ARE WAIVING YOUR RIGHT TO A JURY AND ANY RIGHTS TO APPELLATE RELIEF. IF YOU HAVE ANY QUESTIONS REGARDING THE WAIVER OF THESE RIGHTS, WE URGE YOU TO CONSULT WITH ANOTHER Attorney OF YOUR CHOICE. ANY JUDGMENT ON THE ARBITRATION AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED IN ANY COURT HAVING JURISDICTION. THE ARBITRATION PROCEEDING SHALL BE HELD IN SAN DIEGO.

ANY DISPUTE RELATING TO FEES, COSTS, OR OTHER LEGAL EXPENSES IN DISPUTE, INCLUDING ANY ACTION TO COLLECT MONIES OWED, IS SUBJECT TO THE ARBITRATION PROCEDURE ESTABLISHED BY THE STATE BAR AND CODIFIED AT CALIFORNIA BUSINESS AND PROFESSIONS CODE § 6200 ET SEQ. ANY ACTION RELATING TO SUCH A FEE DISPUTE SHALL BE CONDUCTED IN CONFORMITY WITH THAT STATUTE, NOTWITHSTANDING THE FACT THAT THE PARTIES MAY AGREE TO BINDING ARBITRATION OF SUCH FEE DISPUTES AFTER THE STATUTORY OBLIGATIONS ARE MET OR OTHERWISE CONSISTENT WITH THE STATUTORY SCHEME.

CLIENTS Initial _____
CLIENTS Initial _____
CLIENTS Initial _____

20.    **Mediation.**

If a dispute arises out of or relating to any aspect of this Agreement and/or Attorney's services between CLIENTS and Attorney, the parties shall participate in mediation before James A. Roberts, Esq. before resorting to arbitration, litigation, or any other binding dispute resolution procedure. The parties shall share equally in the costs of said mediation.

21.    **Entire Agreement.**

This Agreement constitutes the entire agreement between CLIENTS and Attorney, and there are no other agreements expanding or modifying its terms, except as stated herein. The provisions of this Agreement can only be modified or amended in a writing signed by CLIENTS and Attorney which expressly states that modification or amendment of this Agreement is intended.

22.    **Severability in Event of Partial Invalidity.**

If any provision of this Agreement is held in whole or in part to be unenforceable for any reason, the remainder of that provision and the entire Agreement will be severable and remain in effect.

CLIENTS Initial _____
CLIENTS Initial _____
CLIENTS Initial _____

23.    Assurances.

Upon compliance with the terms hereof, the parties agree to execute documents necessary to effect the purposes of this Agreement.

### Acceptance and Approval

I have read, accept and approve of the foregoing fee agreement.

Dated: _____, 2011                **QUADE & ASSOCIATES, a PLC**

                                       By: _____
                                           Michael W. Quade
                                           Attorney

Dated: _____, 2011                   By: _____
                                           **TOVA STEIN** – Client
                                           Individually and as trustee for the Stein
                                           Family Trust

Dated: _____, 2011                   By: _____
                                           **STEPHEN STEIN** – Client
                                           Individually and as trustee for the Stein
                                           Family Trust

Dated: _____, 2011                   By: _____
                                           **CHRISTIAN NAYLOR** – Client
                                           Individually and dba Naylor Construction

Dated: _____, 2011                   By: _____
                                           **CHRISTIAN NAYLOR** – Client
                                           As Authorized Representative for Naylor
                                           Construction, Inc.

13.    Agreements.

Upon compliance with the terms hereof, the parties agree to execute documents necessary to effect the purposes of this Agreement.

Acceptance and Approval

I have read, accept and approve of the foregoing fee agreement.

Dated: 1/5, 2011                    QUADE & ASSOCIATES, a PLC

                                    By: _____
                                        Michael W. Quade
                                        Attorney

Dated: _____, 2011           By: _____
                                    TOVA STEIN- Client
                                    Individually and as trustee for the Stein
                                    Family Trust

Dated: _____, 2011           By: _____
                                    STEPHEN STEIN - Client
                                    Individually and as trustee for the Stein
                                    Family Trust

Dated: 8/10, 2011              By: _____
                                    CHRISTIAN NAYLOR - Client
                                    Individually and dba Naylor Construction

Dated: 8/10, 2011              By: _____
                                    CHRISTIAN NAYLOR - Client
                                    As Authorized Representative for Naylor
                                    Construction, Inc.

                                                CLIENTS Initial _____
                                                CLIENTS Initial _____
                                                CLIENTS Initial _____

Page 9 of 9

# EXHIBIT F

### COMMERCIAL LINES POLICY
### COMMON POLICY DECLARATIONS
### NIC INSURANCE COMPANY

6 INTERNATIONAL DRIVE - SUITE 100
RYE BROOK, NY 10573

Policy No. GS409639

NEW
Renewal of Number

**Named Insured and Mailing Address**
(No., Street, Town or City, County, State, Zip Code)

CHRISTIAN NAYLOR
DBA: NAYLOR CONSTRUCTION
P O. BOX 91264
SAN DIEGO, CA 92169

**Producer and Mailing Address**
(No., Street, Town or City, County, State, Zip Code)

BLISS & GLENNON
940 CANTERBURY PL, STE 200
ESCONDIDO, CA 92025

Tax State  CA

Policy Period        From   03-06-2004   to   03-06-2005      at 12:01 A.M. Standard Time
at your mailing address shown above

Form of Business   Individual

Business Description   GENERAL CONTRACTOR

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU
TO PROVIDE THE INSURANCE STATED IN THIS POLICY

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.
THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT

| | PREMIUM |
|---|---|
| Commercial Property Coverage Part | $ Not Covered |
| Commercial General Liability Coverage Part | $ 10,000 00 |
| | $ |
| | $ |
| | $ |
| TOTAL ADVANCE PREMIUM | $ 10,000 00 |
| Other Charges | $ 175.00 |
| Policy Fee | |
| Inspection Fee | $ 125 00 |
| State Tax | $ 309 00 |
| Stamp Fee | $ 23 18 |
| | $ |
| | $ |
| | $ |
| | $ |
| TOTAL | $ 10,632 18 |

Form(s) and Endorsement(s) made a part of this policy at time of issue *
BJP190-0(11/85), ANF159 (06/96), IL0017 (11/85), S2000 (8/91)

* Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

Countersigned  03-10-04        JLS                        By _____
                                                              Countersignature

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S)
AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY
Includes copyrighted material of Insurance Services Office, Inc., with its permission  Copyright, Insurance Services Office, Inc., 1983, 1984

-INSURED-

NC 000046

## COMMERCIAL LINES POLICY
## COMMON POLICY DECLARATIONS
# NIC INSURANCE COMPANY

6 INTERNATIONAL DRIVE - SUITE 100
RYE BROOK, NY  10573

GS409639
Renewal of Number

**Policy No. GS513103**

Named Insured and Mailing Address
(No., Street, Town or City, County, State, Zip Code)

CHRISTIAN NAYLOR
DBA: NAYLOR CONSTRUCTION
P. O. BOX 91264
SAN DIEGO, CA 92169

Producer and Mailing Address
(No., Street, Town or City, County, State, Zip Code)

BLISS & GLENNON
940 CANTERBURY PL, STE 200
ESCONDIDO, CA 92025

Tax State  CA

Policy Period:    From   03-14-2005   to   03-14-2006   at 12:01 A.M. Standard Time
at your mailing address shown above.

Form of Business: Individual

Business Description: GENERAL CONTRACTOR

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU
TO PROVIDE THE INSURANCE STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.
THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

PREMIUM

| | | |
|---|---|---|
| Commercial Property Coverage Part | $ | Not Covered |
| Commercial General Liability Coverage Part | $ | 28,750.00 |
| | $ | |
| | $ | |
| | $ | |
| TOTAL ADVANCE PREMIUM | $ | 28,750.00 |
| Other Charges:   Policy Fee | $ | 175.00 |
| Inspection Fee | $ | 125.00 |
| State Tax | $ | 871.50 |
| Stamp Fee | $ | 65.36 |
| | $ | |
| | $ | |
| | $ | |
| TOTAL | $ | 29,986.36 |

Form(s) and Endorsement(s) made a part of this policy at time of issue *:
BJP190-0(11/85), ANF159 (06/96), IL0017 (11/85), S2000 (8/91)

* Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations.

By _____
Countersigned: 03-13-05    JLS                    Countersignature

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S)
AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.
Includes copyrighted material of Insurance Services Office, Inc., with its permission. Copyright, Insurance Services Office, Inc., 1983, 1984

– PRODUCER –

4-5-05

# EXHIBIT G

p. 2

15 08 03:18p



**433 CALIFORNIA STREET, SUITE 400**
**SAN FRANCISCO, CA. 94104**

TEL: (415) 217-8563 E-MAIL: nbarrow@navg.com
FAX: (415) 956-1718

December 09, 2008

Naylor Construction
2033 San Elijo Avenue #222
Cardiff by the Sea, CA 92007
Attention: Mr. Christian Naylor

RE:    Stephen R. Stein, et al vs. Michael F. Aulert, et al
       1320 Summit Avenue, LLC vs. DCC, et al
       Insured:       Christian Naylor dba: Naylor construction
       Claim Nos.:    CGL161562
       Policy Nos.:   GS409639-0; GS513103
       Claimant:      Stephen R. Stein and Tova Stein, Trustees of the Stein
                      Family Trust dated May 14, 1998
       Project:       1316 Summit Avenue, Encinitas, CA

Dear Policyholder:

This will acknowledge receipt of the San Diego Superior Case No. 37-2008-00092426-
CU-CD-CTL and Case No. 37-2008-00087938-CU-CD-CTL, respectively, captioned
above for potential defense and/or indemnity under the policies of insurance issued by
NIC Insurance Company to Christian Naylor dba: Naylor Construction. We understand
that Attorney George Rikos, 12526 High Bluff Drive, Suite 300, San Diego, CA 92130 is
representing your interests in this matter.

Set forth below are facts and policy terms that NIC Insurance Company has found to be
especially relevant to its review and investigation of this matter. You are encouraged to
review the policies and to call our attention to all additional facts, policy language, legal

2

authority or other information you wish us to consider in the evaluation of the coverage issues in this case.

We understand that Naylor Construction undertook a Services Agreement dated May 26, 2004 with the former property owners, Michael Aulert and Valerie Sherriff (1320 Summit Avenue, LLC) to act as construction manager and general contractor for development of three lots located on Summit Avenue in Encinitas, CA, including the lot in question, 1316 Summit Avenue, which was purchased by the homeowners (Stein) in December, 2006. Three foundations were installed, plus underground plumbing and some framing activity, the latter of which reportedly was performed by employees of Naylor Construction. The foundation work was finaled by the City of Encinitas Building Inspection Division on October 25, 2004; the home itself was finaled by the City on November 21, 2006. According to 1320 Summit Avenue, LLC, Naylor Construction was terminated from the project in 2005, whereupon Development Consultants Consortium ("DCC") was hired to replace Naylor Construction. The homeowners have alleged water intrusion from multiple sources and related mold conditions, among other things, and related claims for bodily injuries.

NIC Insurance Company issued Policy GS409639-0, effective March 06, 2004 to March 06, 2005, to Christian Naylor dba: Naylor Construction. This policy provides $1,000,000 Per Occurrence Limits, $2,000,000 General Aggregate Limits and $2,000,000 Products/Completed Operations Aggregate Limits. Coverage for the policy is provided on form CG 00 01, 07/98. Additional forms specific to NIC Insurance are endorsed to the policy.

NIC Insurance Company issued Policy GS513103, effective March 06, 2005 to March 06, 2006, to Christian Naylor dba: Naylor Construction. This policy provides $1,000,000 Per Occurrence Limits, $2,000,000 General Aggregate Limits and $2,000,000 Products/Completed Operations Aggregate Limits. Coverage for the policy is provided on form CG 00 01, 07/98. Additional forms specific to NIC Insurance are endorsed to the policy.

At this time we invite your attention to the text of the Insuring Agreement of the policies, as set forth in Form CG 00 01, 07/98.

"SECTION I – COVERAGES

COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.    Insuring Agreement

   a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or

3

'property damage' to which this insurance does not apply. We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in this payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b.  This insurance applies to 'bodily injury' and 'property damage' only if:

(1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and

(2) The 'bodily injury' or 'property damage' occurs during the policy period.

c.  Damages because of 'bodily injury' include damage claimed by any person or organization for care, loss of services or death resulting at any time from the 'bodily injury'.

Your policies include the following potentially-applicable exclusions:

1.  **Exclusions**

This insurance does not apply to:

b.  **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed

4

in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

j. **Damage to Property**

"Property damage" to:

(1) Property you own, rent, or occupy;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damages to Premises Rented To You as described in Section III—Limits of Insurance.

5

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

k.    **Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

l.    **Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m.    **Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1)    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2)    A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

n.    **Recall of Products, Work or Impaired Property**

6

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1)    "Your product";

(2)    "Your work"; or

(3)    "impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

The above-cited Insuring Agreement and potentially-applicable exclusions should be read in conjunction with the following policy DEFINITIONS.

2.    'Bodily injury' means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

8.    'Impaired property' means tangible property, other than 'your product' or 'your work', that cannot be used or is less useful because:

a.  It incorporates 'your product' or 'your work' that is known or thought to be defective, deficient, inadequate or dangerous, or

b.  You have failed to fulfill the terms of a contract or agreement; if such property can be restored to use by:

a.  The repair, replacement, adjustment or removal of 'your product' or 'your work'; or

b.  Your fulfilling the terms of the contract or agreement.

9.    'Insured contract' means:

a.  A contract for a lease of premises.  However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an 'insured contract';

b.  A sidetrack agreement;

7

c.  Any easement or license agreement, except in connection with construction or demolition operations within 50 feet of railroad;

d.  An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e.  An elevator maintenance agreement;

f.  That part of any contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement;

Paragraph f. does not include that part of any contract or agreement:

(1)  That indemnifies a railroad for 'bodily injury' or 'property damage' arising out of construction or demolition operations within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2)  That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a)  Preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders, drawings and specifications; or

(b)  Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3)  Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

13.  'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

16.  'Products-completed operations hazard' includes all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except:

(1)  Products that are still in your physical possession; or

8

(2) **Work that has not yet been completed or abandoned.** However, 'your work' will be deemed completed at the earliest of the following times:

    (a) **When all of the work called for in your contract has been completed.**

    (b) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

    (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or sub-contractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include 'bodily injury' or 'property damage' arising out of:

    (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

    (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

    (3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. 'Property damage' means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it.

20. 'Your product' means:

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

    (1) You;

    (2) Others trading under your name; or

9

    (3) A person or organization whose business or assets you have acquired; and

  **b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

'Your product' includes:

  **a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product'; and

  **b.** The providing of or failure to provide warnings or instructions.

'Your product' does not include vending machines or other property rented to or located for the use of others but not sold.

21.   'Your work' means:

  **a.** Work or operations performed by you or on your behalf; and

  **b.** Materials, parts or equipment furnished in connection with such work or operations.

'Your work' includes:

  **a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work', and

  **b.** The providing of or failure to provide warnings or instructions."

According to the San Diego County Recorder's Office, the plaintiffs' home was substantially completed on November 25, 2006. Since Naylor Construction did not complete its work on the home and, in fact, was terminated from the project early on, before the home was completed on November 21, 2006, there can be no coverage under Policy GS409639-0 which expired on March 06, 2005 and/or Policy GS513103 which expired March 14, 2006 for the "completed operations" losses, subject of the lawsuit. The policy provides coverage for accidents, "occurrence(s)" of "bodily injury" or "property damage" which result from the insured's "completed operations". See policy definition of "products-completed operations hazard", definition **16.2.(a),(b)** quoted above. Hence, there is no coverage under the policies for the losses in question.

We understand that Naylor Construction acted as construction manager for development of these three lots, as well as general contractor. The Services Agreement between Naylor and the then property owners, Michael Aulert and Valerie Sherriff (1320 Summit Avenue, LLC) was undertaken May 26, 2004. It includes "general contractor services",

10

as well as "general project management" activities. Your policies include endorsement CG2134CM (11-85) which excludes coverage for construction management activities.

"THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

CG 21 34 11 85

EXCLUSION – DESIGNATED WORK

This endorsement modifies insurance provided under the following.

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

Description of your work

CONSTRUCTION MANAGEMENT FOR A FEE

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement)

This insurance does not apply to 'bodily injury' or 'property damage', 'personal injury' or 'advertising injury' arising out of 'your work' shown in the Schedule.

This endorsement is a part of your policy and takes effect on the effective date of your policy, unless another effective date is shown hereon".

In addition to the moisture intrusion claims, the claimants are making claims for mold conditions and related bodily injury claims.  Please be advised that your policies include endorsement ANF 172, 01/01 which excludes coverage for any/all such claims.

"THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

EXCLUSION -- MOLD

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

This insurance does not apply to:

11

1. 'Bodily injury', 'property damage', or 'personal and advertising injury' arising out of, resulting from, or caused or contributed to by any fungus, mildew or mold or exposure to any fungus, mildew, or mold; or

2. The costs of abatement, mitigation, removal or disposal of any fungus, mildew or mold.

This exclusion also applies to:

1. Any supervision, instructions, recommendations, warnings or advice given or which should have been give in connection with the above; and

2. Any obligation to share damages with or repair someone else who must pay Damages because of such injury or damage, either in equity or in tort.

3. The duty to defend or pay sums which may be owned under the Supplementary Payments provisions of the policy".

We understand that Naylor Construction hired Coast Contracting & Development to perform excavation and foundation work, including waterproofing, drainage, retaining walls under a proposal dated March 02, 2004 which was revised June 21, 2004. The original proposals were amended by change order on September 29, 2004 to include additional work at 1316 Summit Avenue. It is unclear at this time whether Naylor Construction or 1320 Summit Avenue, LLC hired the plumbing subcontractor, Steele Plumbing. In this regard your policies include endorsement ANF 130 (06/98) which includes the following relevant requirements:

"THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## INDEPENDENT CONTRACTORS

The insured hereby represents and warrants that:

1. Commercial general liability insurance coverage for "bodily injury" and "property damage" will be required for all contractors and sub-contractors performing work or operations on behalf of any insured; and the insured shall obtain certificates of insurance from all contractors and sub-contractors performing work or operations on behalf of any insured. Such insurance will be in effect during the duration of the time work is being performed on behalf of any insured; and that

2. The insured will be named as an "additional insured" on the required coverages described in Item 1. above and that

3. The minimum limits and coverages thus required of all contractors and sub-contractors performing work or operations on behalf of any insured shall be:

12

| REQUIRED LIMIT | COMMERCIAL    GENERAL    LIABILITY |
|---|---|
| **FORM** | |
| $1,000,000 | General Aggregate |
| $1,000,000 | Products/Completed Operations Aggregate |
| $1,000,000 | Each Occurrence; |

4.  Any coverage that might otherwise exist under this policy for claims against any insured based on work done for or on behalf of any insured by a contractor or subcontractor is expressly excess over, and will not contribute with the insurance required under this endorsement. No duty to defend or indemnify any insured under this policy for any claims that are or should be covered under the policies required of contractors and subcontractors under this endorsement will exist absent exhaustion of all such contractors' and subcontractors' policies.

The insured understands that this insurance policy has been issued upon these representations and warranties".

With reference to the Independent Contractors Endorsement quoted above, any/all coverage provided by the NIC Insurance Company policies for the alleged claims would be excess over and would not contribute with the insurance required to be provided by Naylor Construction's subcontractors. Under the circumstances you may wish to report this matter to all of your subcontractors and their insurance carriers for the project in question. (Again, however, there is no coverage under the policies for reasons discussed above.)

NIC Insurance Company must respectfully disclaim coverage for this claim due to the exclusionary language set forth above. It is NIC Insurance Company's position that it does not have a duty to defend or indemnify Christian Naylor dba: Naylor Construction in this matter under Policies GS409639-0 and/or GS513103.

By setting forth the above, NIC Insurance Company does not intend to waive any of the terms, conditions, or defenses available to it under the insurance Policies GS409639-0 and/or GS513103,or pursuant to California law.

If there are facts or issues not addressed herein, or which come to light in the future with respect to this claim which you believe may affect our position, please bring them to our attention immediately and we will take them into consideration.

Should you disagree with the coverage position taken by NIC Insurance Company regarding Policies GS409639-0 and/or GS513103, you do have the right to have this matter reviewed by the California Department of Insurance located at:

13

California Department of Insurance
Claim Service Bureau
300 South Spring Street, 11th Floor
Los Angeles, Ca. 90013

Telephone: (800) 927-4357, or
(213) 897-8921

Yours truly,

Nancy Barrow
Litigation Specialist

cc:     Law Offices of George Rikos
        12526 High Bluff Drive, Suite 300
        San Diego, CA 92130

        Bliss & Glennon
        940 Canterbury Place, Suite 200
        Escondido, CA 92025
        Attention: Ms. Mary Glass

        The Insurance Store
        10 Encinitas Blvd.
        Encinitas, CA 92024
        Attention: Mr. William Reder

# EXHIBIT H

# LUTZ & LUTZ, APC

## ATTORNEYS AT LAW

1307 Stratford Court, Del Mar, California 92014
(858) 259-9826   ·   Fax (858) 259-9884

August 10, 2011

*U.S. Mail Certified, RRR*

Nancy Barrow
Litigation Specialist
Navigator Insurance
433 California Street, Ste. 400
San Francisco, CA  94104

RE:   *Stein v. Naylor Construction*
      Claim No.   CGL161562
      Policy No.   GS409639-0
                   GS513103
      Your Insured:  Naylor Construction

Dear Ms. Barrow:

Enclosed please find a copy of Naylor Construction's Motion for Good Faith Settlement, Declaration in Support and Proposed Order.  This was also faxed today to (415) 956-1718. Enclosed is that fax confirmation sheet.

Please give me a call should you have any questions.

Sincerely,

LUTZ & LUTZ

Carolyn P. Gallinghouse

cpg
Enclosures as noted

**LUTZ & LUTZ, APC**
1307 Stratford Court
Del Mar, CA 92014
Telephone:  (858) 259-9826
Facsimile:   (858) 259-9884

# FAX COVER SHEET

Date:        August 10, 2011

To:          Nancy Barrow
             Litigation Specialist

Fax No:      (415) 956-1718

From:        Gregory A. Lutz

Re:          *Stein v. Naylor Construction*

| Description | Number of Pages* |
|---|---|
| Naylor Motion for Good Faith Settlement | 18 |
|  |  |
|  |  |

**Comments:**

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that dissemination, distribution, or copying of this communication is strictly prohibited.

* COUNTING COVER SHEET.
IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US IMMEDIATELY AT (858) 259-9826.

HP Officejet Pro 8500 A909a All-in-One series

Fax Log for
Lutz & Lutz, APC
(858) 259-9884
Aug 10 2011 1:15PM

**Last Transaction**

| Date | Time | Type | Station ID | Duration Digital Fax | Pages | Result |
|------|------|------|------------|---------------------|-------|--------|
| Aug 10 | 1:10PM | Fax Sent | 14159561718 | 4:35 N/A | 18 | OK |

Note:
Image on Fax Send Report is set to On

An image of page 1 will appear here for faxes that are sent as Scan and Fax.



QUADE & ASSOCIATES, a PLC
3377 Carmel Mountain Road, Suite 250
San Diego, CA 92121

Telephone: (858) 642-1700
Facsimile: (858) 642-1778

September 1, 2010



*Via U.S. Mail - Certified Return Receipt and Facsimile*

**CONFIDENTIAL MEDIATION PRIVILEGED DOCUMENT
PROTECTED UNDER CODE OF CIVIL PROCEDURE § 1755
ET SEQ. AND EVIDENCE CODE §§ 115, 1128, 1152 ET SEQ.**

*NOTICE OF TENDER AND NOTICE OF POTENTIAL CLAIM*

Lincoln General Insurance Company
Construction Defect Unit
P.O. Box 3608
York, PA 17402-0628

Fax No: (717) 751-0144

Re:   ***Stein v. Aulert, et al.***
      Our Clients:          Stephen and Tova Stein
      Insured:              Steele Plumbing
      Certificate Holder:   Christian Naylor dba Naylor Construction (erroneously sued as
                            Naylor Construction, Inc.)
      Policy Nos.:          25370282590 and AC13060104
      Arbitration Date:     October 25 - 29, 2010

To Whom It May Concern:

Please be advised that this office has been retained to represent Mr. and Mrs. Stephen R. Stein with regard to serious water-damage related issues at their home located at 1316 Summit Avenue in Cardiff, California.

This correspondence shall serve to place your company and all relevant insurance agents and/or carriers **on notice** of your potential obligations and liability with regard to their damages and your potential obligations to provide coverage under any policies that may have been in effect that provide coverage for the Steins' loss.

A complaint has been filed in this matter, and a copy can be provided upon your request. In addition, the following background may assist you in your investigation.

We understand that coverage was not provided to Naylor, and by way of this correspondence we ask that you provide in writing and in detail the basis for the lack of coverage being afforded. As you may be aware, there was damage done to the subject property after Naylor's work was completed.

The Steins purchased their home on or about December 13, 2006 from 1320 Summit Avenue LLC. The Steins had only resided in their home for a very short period of time, when in the summer of 2007, they discovered that all three levels of their home have been affected by serious moisture

G:\STEIN Tender\Steele Plumbing for Naylor 090110.wpd

QUADE &ASSOCIATES, a PLC

Re:     *Stein v. Aulert, et al.*
September 1, 2010
Page 2

intrusion problems and related damage. In addition to water damage, the Steins have confirmed the existence of other defects and deficiencies existing at the home, including but not limited to the roofs, surface drainage system, plumbing system, waterproof system, and various other architectural, civil and mechanical problems.

Significant discovery has been conducted to date that reveals damage to the home as a result of Naylor's work during the policy period that damaged the work of others. Plaintiffs' Cost of Repair and Defect List is enclosed for your review and files.

Apart from these construction related issues, the damage is so significant that it has affected the Steins' health. As such, in order to mitigate their damages, in the interests of their health, and due to the home's uninhabitable condition, my clients were forced to move out of their home in September 2007 and re-locate to alternate housing pending the resolution of the issues with their home. They still remain out of their home.

We believe that the evidence to date shows a significant risk of exposure should this matter proceed to trial. We feel that a jury will be sympathetic to the Steins' claims as they have done nothing wrong other than purchase the wrong home. Rather, their damages are the direct result of the errors and omissions of others. They have a cost to repair that exceeds $1,000,000.00 and have substantial relocation and personal injury claims. Their total claim at the time of the last mediation exclusive of attorney fees and costs exceeded $3,000,000.00. As you know there is a substantial risk that the trier of fact will make a determination that Naylor Construction is jointly and severally liable for all damages. Should Plaintiffs succeed in their claims against Naylor Construction, Naylor Construction also risks being subjected to statutory costs and investigatory *Stearman* costs which presently total approximately $190,000.00.

Please note that there is a document depository for this case and it is located at Veritext National Deposition & Litigation Services, 402 W. Broadway, Suite 1910, San Diego, CA 92101; Telephone: (619) 231-0403. The depository has all of the documents deposited by the plaintiffs, subcontractors and developer.

Additionally, Arbitration in this matter has been set for October 25, 2010.

A copy of the relevant policy information is also enclosed herewith.

Your prompt attention to this matter is appreciated. Time is of the essence. Should you have any questions, comments or concerns, please do not hesitate to contact our office.

Very truly yours,

QUADE & ASSOCIATES, A PLC

Michael W. Quade

MWQ:an

Enclosures: Noted (via U.S. Mail Only)

cc: Gregory Lutz, Esq.

QUADE & ASSOCIATES, a PLC
3377 Carmel Mountain Road, Suite 250
San Diego, CA 92121

Telephone: (858) 642-1700
Facsimile: (858) 642-1778

September 1, 2010

FACSIMILE TRANSMITTAL

TO:                        Lincoln General Insurance Company
                           Construction Defect Unit
                           **Fax No. (717) 751-0144**

FROM:                      Michael W. Quade, Esq.

FILE NAME:                 *Stein v. Aulert, et al.*

NUMBER OF PAGES:           3, (including cover)

＊   ＊   ＊   ＊   ＊

IF YOU DO NOT RECEIVE ALL OF THE PAGES TRANSMITTED
HEREWITH, PLEASE CONTACT QUADE & ASSOCIATES, a PLC
AT (858) 642-1700

9:28 am

ACTION REQUESTED:

        Please find attached correspondence (without enclosures) dated September 1, 2010. The
original with enclosures will follow via certified mail.

The information contained in this facsimile message is attorney privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone, and return the original message to us at the above address via the U.S. Postal Service. Thank you.

QUADE & ASSOCIATES, PLC Fax:858-642-1778

## \*\* Transmit Confirmation Report \*\*

P.1
Line Number:1

Sep  1 2010 09:29am

| Name/Fax No. | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 17177510144 | Normal | 01.09:27am | 1'23" | 3 | O K | |

QUADE & ASSOCIATES, a PLC
9377 Carmel Mountain Road, Suite 250
San Diego, CA 92121
telephone (858) 642-1799
facsimile (858) 642-1778

September 1, 2010

FACSIMILE TRANSMITTAL

TO:               Lincoln General Insurance Company
                  Construction Defect Unit
                  Fax No. (717) 751-0144

FROM:             Michael W. Quade, Esq.

FILE NAME:        *Stein v. Atlert, et al.*

NUMBER OF PAGES:  3 (including cover)

          IF YOU DO NOT RECEIVE ALL OF THE PAGES TRANSMITTED
          HEREWITH, PLEASE CONTACT QUADE & ASSOCIATES, a PLC
          AT (858) 642-1799

                          9:28 am

ACTION REQUESTED:

     Please find attached correspondence (without enclosures) dated September 1, 2010.  The
original with enclosures will follow via certified mail.

| 2. Article Number | COMPLETE THIS SECTION ON DELIVERY | | |
|---|---|---|---|
| | A. Received by (Please Print Clearly) | B. Date of Delivery | |
| 7160 3901 9848 2376 3162 | S Conter | 9/7/10 | |
| | C. Signature | | ☐ Agent |
| | X _Sam Cabo_ | | ☐ Addressee |
| 3. Service Type   **CERTIFIED MAIL** | D. Is delivery address different from item 1? | | ☐ Yes |
| 4. Restricted Delivery? *(Extra Fee)*   ☐ Yes | If YES, enter delivery address below: | | ☐ No |

1. Article Addressed to:

Lincoln General Insurance Company
Construction Defect Unit
P.O. Box 3608
York, PA 17402-0628

SEP - 7 2010

CLG

Stein                    Domestic Return Receipt

PS Form 3811, July 2001



J

# YARON & ASSOCIATES
### A T T O R N E Y S   A T   L A W

GEORGE D. YARON, ESQ.*
JAMES I. SILVERSTEIN, ESQ.§
DAVID GRAY DOUGLAS, ESQ.*
G. DAVID STEELE, ESQ.§
HENRY M. XU, ESQ.§
KEITH B. PATTERSON, ESQ.†

HELEN CHAN, ESQ.†
LISA A. TAPPER, ESQ.§
IAN C. MACKOSIEN, ESQ.†
BRENTLEY F. YIP, ESQ.†
KEVIN C. CHAU, ESQ.†

*ADMITTED IN CALIFORNIA
†ADMITTED IN NEVADA

401 CALIFORNIA STREET · TWENTY-FIRST FLOOR
SAN FRANCISCO · CALIFORNIA  94108-2626
TELEPHONE: (415) 658-2929
FACSIMILE: (415) 658-2930

September 23, 2011

*Via Certified Mail and Facsimile*

Gregory A. Lutz, Esq.
Lutz & Lutz
1307 Stratford Court
Del Mar, California 92014
Facsimile: (858) 259-9884

    Re:    *Stephen Stein v. Michael F. Aulert, et al.*
           Lincoln General Insured:      Steele Plumbing, Inc.
           Lincoln General Claim No.:   7007497
           Our File No.:              3678
           Your Client:             Naylor Construction Company
           Your File No.:           Unknown

Dear Mr. Lutz:

    Lincoln General Insurance Company ("LGIC") has requested that we provide its response to the constructive tender of defense of your client, Naylor Construction Company ("NCC"), with regard to the claims asserted in the above-entitled matter.[1]  LGIC is a general liability carrier for Steele Plumbing, Inc. ("SPI"), a corporation under the following policies: (1) No. 2537028259-0, policy period March 1, 2004 to March 1, 2005; and (2) No. 6320024398-00, policy period March 1, 2005 to March 1, 2006.

    The policies were issued pursuant to all of the terms, conditions, limitations, exclusions and endorsements contained therein.

    After careful consideration, and investigation of this matter, LGIC has confirmed that it has no defense or indemnity obligations to NCC with respect to this matter, and so LGIC cannot accept

---

[1]  To the best of our understanding, NCC never tendered its defense to LGIC as an alleged "additional insured." However, on August 12, 2011, your office sent correspondence to LGIC, enclosing an Amended Motion for Good Faith Settlement Determination on NCC's behalf.  In that amended motion, NCC asserted that it had rights as an "additional insured" under the LGIC policies issued to Steele Plumbing, Inc.

3678.gl.declmr.23.sept.11.wpd

Gregory A. Lutz, Esq.
Lutz & Lutz
September 23, 2011
Page 2

_____

your client's constructive tender of defense here.

In this letter, we explain the basic reasons for LGIC's conclusions regarding the tender. LGIC fully and expressly reserves all of its rights in this matter, and does not intend to waive any of its rights, even if it fails to raise particular coverage issues in this letter.

## I.    FACTUAL BACKGROUND

We outline the factual background as we understand it. Please advise us if we are incorrect in any significant respect. To the extent that this "Factual Background" section provides a summary of claims or complaints, we do not mean to suggest that the allegations in the claims or complaints are true.

### A.    Basic Background Information

The above-referenced matter involves claims of water damage and construction defects to a single-family residence located in the "Cardiff" neighborhood of Encinitas, California. NCC was hired by the Developer, 1320 Summit Avenue, LLC ("Developer"), as the original General Contractor. In turn, NCC hired SPI to perform the underground plumbing operations prior to the construction of the home. Following the completion of SPI's operations, the Developer fired NCC and hired a replacement General Contractor.

The homeowner Plaintiffs have now filed suit against the Developer, NCC, and SPI, among others, alleging that various plumbing leaks, drainage defects, and the defective waterproofing of walls, windows and foundations, have caused water infiltration into the lower levels of the residence, along with mold growth.

### B.    The Homeowners' Complaint

On or about September 23, 2008, the homeowner Plaintiffs filed a Complaint for Damages against the Developer, NCC and various other parties, including SPI, alleging causes of action for Strict Liability, Breach of Contract, Breach of Implied and Express Warranties, two counts of Negligence, Negligence Per Se, Negligent Misrepresentation, and Breach of Fiduciary Duty, in the San Diego Superior Court, case number 37-2008-00092426-CU-CD-CTL. The only cause of action against SPI and NCC is one of the two Negligence counts.

The homeowners' Complaint alleges that the Developer retained Valerie Sherriff to serve as the project manager for the construction of the property at-issue in January, 2004, and that Ms.

Gregory A. Lutz, Esq.
Lutz & Lutz
September 23, 2011
Page 3

---

Sherriff was the Developer's agent. The Complaint further alleges that the Developer retained DG Design in January 2004 to draft the plans for the property's construction. The Complaint alleges that the Developer retained NCC to act as the General Contractor for the project in 2004.

The Complaint further contends that NCC and certain subcontractors began construction of the property in 2005, but that NCC was terminated by the Developer in 2005. The Developer then retained another party to act as the replacement General Contractor on July 8, 2005. The Complaint asserts that, at the time the replacement General Contractor was retained, "all foundation and underground plumbing had been completed."

The Complaint alleges that the property was "completed" on November 25, 2006, pursuant to a "Notice of Completion" recorded with the County of San Diego. Plaintiffs subsequently purchased the home, with escrow closing on December 13, 2006.

Plaintiffs allege that they discovered the first water leaks in July, 2007, in the basement/theater room, and then in the "powder room vanity." Thereafter, Plaintiffs began investigating the leaks, and discovered substantial water intrusion and damages to "the entire lower level" of the home. Plaintiffs further contend that, at the time of discovering the water damages, they began to suffer from various alleged physical injuries, including "headaches, disorientation, burning and itching eyes and ears, dry cough, shortness of breath, shingles and emotional distress," as well as "health related and/or exacerbation of certain disease symptoms." Plaintiffs assert that they moved out of the home in mid-September, 2007.

Plaintiffs allege the following construction defects and damages: "serious water damage to all interstitial spaces opened up to date; defective drainage; defective waterproofing systems; defective framing; defective foundation systems; defective retaining walls; defective plumbing; defective sprinkler systems; defective drywall; defective heating and air-conditioning systems; poor landscaping; defective irrigation installation; defective roofing systems and resultant damages." The Complaint alleges that the Developer and the subcontractors, including NCC and SPI, were negligent in the performance of their operations, leading to the defects and damages at-issue.

Plaintiffs seek to recover damages for emotional distress, "personal injuries," medical expenses, loss of consideration, "carrying costs of the home," loss of investment capital, costs of repair and improvements, taxes paid, attorney's fees and expert costs, escrow and closing costs, diminution in value, and interest.

//
//

3678.ni.dxclmr.23.sept.11.wpd

Gregory A. Lutz, Esq.
Lutz & Lutz
September 23, 2011
Page 4

### C.   SPI's Contract and Scope/Duration of Work

We understand that the Developer hired NCC to act as the General Contractor for the construction of the home, located at 1316 Summit Avenue, Cardiff/Encinitas, California, sometime in 2004.  NCC retained SPI to perform the underground plumbing operations prior to the construction of the home, in or about November, 2004.  We understand that SPI finished its operations in or about April, 2005.

The Developer then fired NCC on or before July 8, 2005.  At the time NCC was fired, and the replacement General Contractor was retained, all design work, foundations, underground plumbing, and thirty (30) percent of the framing had been completed.  No other portions of the home had yet been constructed.

We further understand that the property was "completed" on or about November 25, 2006, when the "Notice of Completion" was filed with the County of San Diego.  The Plaintiff homeowners purchased the subject property on or about December 13, 2006.  Finally, we understand that Plaintiffs first discovered the construction defects, and attendant water intrusion, in the property during July, 2007.

Pursuant to a "Statement of Work" submitted by SPI, on or about August 5, 2009, SPI's scope of work was:

> Supplied all underground plumbing to include waste, vent, water and gas to all said fixtures on plans, excluding fixtures.  Carried waste to 5 feet outside residence; picked up water 5 feet from residence and ran gas from meter to within 5 feet of residence.

SPI also advised that, as part of its operations, it supplied "ABS waste piping and fittings." SPI did not utilize any subcontractors.  It was paid approximately $3,954.50 for its work on the project.

### II.   "WHO IS AN INSURED"

As a general rule, an insurer only owes coverage obligations to parties that are "insured" under the terms of the policy upon which coverage is being asserted. (*Alex Robertson v. Imperial Counsel Indemn. Co.* (1992) 8 Cal.App.4th 338, 343, 346.)

//

3675.af.disclmr.23.sept.11.wpd

Gregory A. Lutz, Esq.
Lutz & Lutz
September 23, 2011
Page 5

A.    NCC Is Not an "Insured" Under the LGIC Policies

Here, the LGIC policies were issued to SPI, as a corporation, located in El Cajon, California. NCC is not listed as a "named insured" on the policies.

NCC does not otherwise qualify as an "insured" under the "Who Is An Insured" Section of the policies either.  That Section provides, in pertinent part, that:

If you are designated in the Declarations as:

a.    An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner;

\*          \*          \*

Each of the following is also an insured:

a.    Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees" . . . but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business;

\*          \*          \*

b.    Any person . . . or any organization while acting as your real estate manager;

c.    Any person or organization having proper temporary custody of your property if you die . . . .

\*          \*          \*

d.    Your legal representative if you die, but only with respect to duties as such . . . .

With respect to "mobile equipment" registered in your name under

1578.al.dvclmr.23.sept.11.wpd

Gregory A. Lutz, Esq.
Lutz & Lutz
September 23, 2011
Page 6

---

> any motor vehicle registration law, any person is an insured while
> driving such equipment along a public highway with your permission.
>
> \*          \*          \*
>
> Any organization you [SPI] newly acquire or form, other than a
> partnership, joint venture or limited liability company, and over
> which you maintain ownership or majority interest, will qualify as a
> Named Insured if there is no other similar insurance available to that
> organization. . . .

NCC does not qualify as an "insured" under any of these sections. Hence, LGIC cannot accept the tender of defense here.

### B.    "Additional Insured" Coverage

It appears that NCC was added as an "additional insured" on the 2004/2005 LGIC policy issued to SPI only, pursuant to an "Additional Insured Endorsement" written on form CG 2010 (03 97). That form provides the following, in pertinent part:

> Who is An Insured (Section II) is amended to include as an insured
> the person or organization shown in the Schedule, but only with
> respect to liability arising out of your [SPI's] ongoing operations
> performed for that insured.

Accordingly, NCC's "additional insured" status under the 2004/2005 LGIC policy issued to SPI was limited to "ongoing operations"; that is, for damages that allegedly occurred while SPI's construction operations were still taking place. NCC is not listed as an "additional insured" with regard to "completed operations" claims.

Here, the instant matter does not involve any claims for "ongoing operations" damages; rather, like most construction defect claims, this matter involves claims of "completed operations" damages to the building following the completion of construction, mostly affiliated with weather-related water intrusion/leaking claims. Since NCC is not an "additional insured" for "completed operations," there is no potential for coverage for NCC here. For this reason, among all others cited herein, LGIC cannot accept the tender of defense.

//

3578.ai.disclmr.23.sept.11.wpd

Gregory A. Lutz, Esq.
Lutz & Lutz
September 23, 2011
Page 7

---

III.   "FIRST MANIFESTS" REQUIREMENT

Even if the Plaintiffs were seeking to recover "property damage" that took place while SPI was performing its underground plumbing operations here, and they are not, the 2004/2005 LGIC policy only applies to "property damage" that "first manifests" during the LGIC policy period. In this regard, the insuring clause of the LGIC policy provides, in pertinent part, that:

> This insurance applies to "bodily injury" and "property damage" only if:
>
> (1)   The "bodily injury" and "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
>
> (2)   The "bodily injury" or "property damage" first manifests during the policy period.

The policy further provides that "property damage" first manifests "at the time it is apparent to any person, including, but not limited to, an 'insured,' a 'claimant,' or a property owner."

Hence, for the 2004/2005 LGIC policy to be applicable to any "property damage," that "property damage" must have first manifested during the policy period. Here, however, the Plaintiffs have specifically alleged that they first discovered any of the alleged defects and damages in July, 2007, many years after the expiration of the LGIC policy period. Accordingly, the 2004/2005 LGIC policy is not even potentially implicated here.

For this reason, among all others cited herein, there is no potential for coverage for NCC, and so LGIC cannot accept the tender of defense.

IV.   EXCLUSIONS

Even if this matter involved "ongoing operations" damages, and it does not, and even if such damages "first manifested" during the 2004/2005 LGIC policy period, and they did not, such that NCC's "additional insured" status was otherwise implicated, there are various policy exclusions contained in the policy which would apply to entirely preclude coverage here for NCC in any event.

LGIC points out the following exclusions as applicable, and expressly reserves all of its rights under all of the exclusions in the 2004/2005 LGIC policy, including all exclusions not specifically discussed herein.

1673.al.dsclmr.23.sept.11.wpd

Gregory A. Lutz, Esq.
Lutz & Lutz
September 23, 2011
Page 8

_____

### A.   Exclusion "J(5)"

Exclusion "J(5)" excludes coverage for property damage to "that particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of these operations."

In essence, this Exclusion precludes coverage for "property damage" arising during the "active operations" of the insured to that "particular piece of real property" upon which the "named insured" or its subcontractors, are performing operations at the time of the "accident." The California Courts have held that Exclusions "J(5)" and "J(6)" apply to exclude coverage for "damage to the property caused during the ongoing construction operations performed by the contractor or subcontractor. . . . [such that] the policy applies to completed work or operations" only. (*Baroco West, Inc. v. Scottsdale Ins. Co.* (2003) 110 Cal.App.4th 96, 103-104.)

In the instant case, this Exclusion applies to preclude coverage for any damages to the property at-issue on which SPI was working that are alleged to have occurred during SPI's "ongoing operations." To the extent that any alleged "property damage" occurred to real property on which SPI was performing operations, while it was performing those operations, this Exclusion would apply to preclude coverage for such damages. Simply put, this Exclusion applies to preclude coverage for any "property damage" that is alleged to have actually taken place during SPI's "ongoing operations" on the project.

Here, NCC's status as an "additional insured" was limited to claims for "property damage" to real property that actually happened during SPI's "ongoing operations" on the project. This Exclusion serves to preclude coverage for all such claims. Accordingly, even if this matter involved "ongoing operations" damages to real property that happened while SPI was still performing its operations, and it does not, and even if such damages "first manifested" during the LGIC policy period, and they did not, this Exclusion would serve to entirely preclude coverage for all such claims here in any event.

For this reason, together with all others referenced in this letter, there is no potential for coverage here, and so LGIC must disclaim coverage for NCC.

### B.   Exclusion "J(6)"

Exclusion "J(6)" precludes coverage for "that particular part of property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." However, this Exclusion expressly provides that it is not applicable to "property damage" included in the

3678.si.dre.tmr.23.sept.11.wpd

Gregory A. Lutz, Esq.
Lutz & Lutz
September 23, 2011
Page 9

"products-completed operation hazard." Hence, this Exclusion applies only to damages caused during SPI's "active operations." The primary difference between this Exclusion, and Exclusion "J(5)," discussed above, is that "J(5)" applies to "real property," whereas this Exclusion applies to any property.

For this reason, together with all others referenced in this letter, there is no potential for coverage here, and so LGIC must disclaim coverage for NCC.

C.   **Exclusion "M"**

Exclusion "M" attached to the 2004/2005 LGIC policy precludes coverage for:

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

1.   A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

2.   A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

The LGIC policy defines "impaired property" as:

[T]angible property, other than "your product" or "your work" that cannot be used or is less useful because:

a.   It incorporates "your product" or "your work", that is known or thought to be defective, deficient, inadequate or dangerous;

b.   You have failed to fulfill the terms of the

5678.ai.dzclmr.23.sept.11.wpd

Gregory A. Lutz, Esq.
Lutz & Lutz
September 23, 2011
Page 10

---

                    contract or agreement;

if such property can be restored to use by:

    a.    The repair, replacement, adjustment or removal of "your product" or "your work"; or

    b.    Your fulfilling the terms of the contract or agreement.

Finally, the LGIC policy defines "your work" in pertinent part, to include:

    a.    Work or operations performed by you or on your behalf; and

    b.    Materials, parts or equipment furnished in connection with such work or operations.

In essence, Exclusion "M" precludes coverage for the "loss of use" portion of the "property damage" definition contained in the policy. This Exclusion precludes coverage for "loss of use" of property that is not physically injured, but cannot be used due to the defective or incomplete work of the insured, if that property can be restored to use by the remediation of the insured's allegedly defective work.

Additionally, this Exclusion similarly applies to preclude coverage for any costs associated with repairing, replacing, or completing the work of SPI. There is no coverage for costs incurred to repair, replace, or complete SPI's work.

For this reason, together with all others referenced in this letter, there is no potential for coverage here, and so LGIC must disclaim coverage for NCC.

## V.   NOTICE TO INSURANCE COMMISSIONER

If NCC believes that LGIC's position is incorrect, or constitutes a wrongful or improper declination of its claim, NCC should feel free to contact us, and LGIC will reconsider its position based on whatever information may be available. In addition, if it wishes, NCC may have this matter reviewed by the California Department of Insurance. The California Department of Insurance may be contacted by calling (800) 927-HELP, or by writing to the Department at this address:

3678.oi.declmr.23.sept.11.wpd

Gregory A. Lutz, Esq.
Lutz & Lutz
September 23, 2011
Page 11

---

California Department of Insurance
Claim Services Bureau
300 South Spring St., 11th Floor
Los Angeles, CA 90013

## CONCLUSION

LGIC trusts that NCC understands its coverage position. NCC only qualifies as an "additional insured" with respect to "ongoing operations" damages under the 2004/2005 LGIC policy issued to SPI. There are no allegations of any "ongoing operations" damages here, and so there is no potential for coverage for NCC.

Moreover, the 2004/2005 LGIC policy only applies to "property damage" that "first manifests" during the policy period. Here, Plaintiffs specifically allege that they did not discover any of the alleged defects and damages prior to July, 2007, several years after the expiration of the LGIC policy.

Further, since NCC's status as an "additional insured" is limited to coverage for claims for potential "property damage" that took place during SPI's "ongoing operations," any such "ongoing operations" claims would necessarily be precluded from coverage by application of the standard "ongoing operations" Exclusions "J(5)," "J(6)," and "M," in any event.

LGIC reiterates that it fully and expressly reserves all of its rights in this matter, and does not intend to waive any of its rights under its policies or any terms, conditions, exclusions or endorsements contained therein, even if not expressly discussed in this letter.

If NCC has any questions or comments, please do not hesitate to contact us. Similarly, if NCC believes that LGIC is incorrect in any respect, or if it wishes to bring any matter to the attention of LGIC, please do not hesitate to do so.

Very truly yours,

DAVID G. DOUGLAS

DGD/hs

//

1678.ni.drol.mc.23.sept.11.wpd

Gregory A. Lutz, Esq.
Lutz & Lutz
September 23, 2011
Page 12

cc:     [via email only]

        Diana Ybarra
        Lincoln General Insurance Company

3671.ai.declmr.23.sept.11.wpd

# EXHIBIT K

QUADE & ASSOCIATES, a PLC
3377 Carmel Mountain Road, Suite 250
San Diego, CA 92121

Telephone: (858) 642-1700
Facsimile: (858) 642-1778

September 1, 2010



*Via U.S. Mail - Certified Return Receipt and Facsimile*

**CONFIDENTIAL MEDIATION PRIVILEGED DOCUMENT
PROTECTED UNDER CODE OF CIVIL PROCEDURE § 1755
ET SEQ. AND EVIDENCE CODE §§ 115, 1128, 1152 ET SEQ.**

*NOTICE OF TENDER AND NOTICE OF POTENTIAL CLAIM*

Geoffrey V. Pohl
Claims Examiner
Vela Insurance Services, Inc.
11516 Nicholas, Street, Suite 301
Omaha, NE 68154

Fax No.: (402) 492-3283

| Re: | *Stein v. Aulert, et al.* | |
|---|---|---|
| | Our Clients: | Stephen and Tova Stein |
| | Insured: | Coast Contracting and Development, Inc. |
| | Certificate Holder: | Christian Naylor dba Naylor Construction (erroneously sued as Naylor Construction, Inc.) |
| | Policy No.: | 575BAAS3798 |
| | Arbitration Date: | October 25 - 29, 2010 |

Dear Mr. Pohl:

As you know this office has been retained to represent Mr. and Mrs. Stephen R. Stein with regard to serious water-damage related issues at their home located at 1316 Summit Avenue in Cardiff, California.

We understand that coverage was not afforded to Naylor Construction and by way of this correspondence we ask that you provide in writing and in detail the basis for the failure to provide coverage. As you may be aware, there was damage done to the subject property after Naylor's work was completed.

The Steins purchased their home on or about December 13, 2006 from 1320 Summit Avenue LLC. The Steins had only resided in their home for a very short period of time, when in the summer of 2007, they discovered that all three levels of their home have been affected by serious moisture intrusion problems and related damage. In addition to water damage, the Steins have confirmed the existence of other defects and deficiencies existing at the home, including but not limited to the roofs, surface drainage system, plumbing system, waterproof system, and various other architectural, civil and mechanical products. Negligence with respect to installing the slab and CMU/waterproofing has caused damage to other parts of the home.

QUADE &ASSOCIATES, a PLC

Re:     *Stein v. Aulert et al.*
September 1, 2010
Page 2

Significant discovery has been conducted to date that reveals damage to the home as a result of Naylor's work during the policy period.  Plaintiffs' Cost of Repair and Defect List is enclosed for your review and files.

Apart from these construction related issues, the damage is so significant that it has affected the Steins' health.  As such, in order to mitigate their damages, in the interests of their health, and due to the home's uninhabitable condition, my clients were forced to move out of their home in September 2007 and re-locate to alternate housing pending the resolution of the issues with their home. They still remain out of their home.

We believe that the evidence to date shows a significant risk of exposure should this matter proceed to trial.  We feel that a jury will be sympathetic to the Steins' claims as they have done nothing wrong other than purchase the wrong home. Rather, their damages are the direct result of the errors and omissions of others.  They have a cost to repair that exceeds $1,000,000.00 and have substantial relocation and personal injury claims.   Their total claim at the time of the last mediation exclusive of attorney fees and costs exceeded $3,000,000.00.   As you know there is a substantial risk that the trier of fact will make a determination that Naylor Construction is jointly and severally liable for all damages. Should Plaintiffs succeed in their claims against Naylor Construction, Naylor Construction also risks being subjected to statutory costs and investigatory *Stearman* costs which presently total approximately $190,000.00.

Please note that there is a document depository for this case and it is located at Veritext National Deposition & Litigation Services, 402 W. Broadway, Suite 1910, San Diego, CA 92101; Telephone: (619) 231-0403.  The depository has all of the documents deposited by the plaintiffs, subcontractors and developer.

Additionally, Arbitration in this matter has been set to begin on October 25, 2010.

Your prompt attention to this matter is appreciated.  Should you have any questions, comments or concerns, please do not hesitate to contact our office.

Very truly yours,

QUADE & ASSOCIATES, A PLC

Michael W. Quade

MWQ:an

Enclosures: Noted (via U.S. Mail Only)

cc: Gregory Lutz, Esq.

## QUADE & ASSOCIATES, a PLC
3377 Carmel Mountain Road, Suite 250
San Diego, CA 92121

Telephone: (858) 642-1700
Facsimile: (858) 642-1778

September 1, 2010

FACSIMILE TRANSMITTAL

TO:             Geoffrey V. Pohl
                Claims Examiner
                Vela Insurance Services, Inc.
                **Fax No. (402) 492-3283**

FROM:           Michael W. Quade, Esq.

FILE NAME:      *Stein v. Aulert, et al.*

NUMBER OF PAGES:    3, (including cover)

\*   \*   \*   \*   \*

IF YOU DO NOT RECEIVE ALL OF THE PAGES TRANSMITTED
HEREWITH, PLEASE CONTACT QUADE & ASSOCIATES, a PLC
AT (858) 642-1700

9:23 am

ACTION REQUESTED:

Please find attached correspondence (without enclosures) dated September 1, 2010. The original with enclosures will follow via certified mail.

The information contained in this facsimile message is attorney privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone, and return the original message to us at the above address via the U.S. Postal Service. Thank you.

QUADE & ASSOCIATES,PLC Fax:858-642-1778

## ** Transmit Confirmation Report **

P.1                                                    Sep  1 2010 09:23am
Line Number:1

| Name/Fax No. | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 14024923283 | Normal | 01.09:22am | 0'48" | 3 | # O K | |

### QUADE & ASSOCIATES, a PLC
12774 Jamaul Mountain Road, Suite 250
San Diego CA 92121

Telephone (858) 642-1746
Facsimile (858) 642-1778

September 1, 2010

FACSIMILE TRANSMITTAL

TO:             Geoffrey V. Pohl
                Claims Examiner
                Vela Insurance Services, Inc.
                Fax No. (402) 492-3283

FROM:           Michael W. Quade, Esq.

FILE NAME:      *Stein v. Anlert, et al.*

NUMBER OF PAGES: 3, (including cover)

* * * * *

IF YOU DO NOT RECEIVE ALL OF THE PAGES TRANSMITTED
HEREWITH, PLEASE CONTACT QUADE & ASSOCIATES, a PLC
AT (858) 642-1746

9:23 am

ACTION REQUESTED

Please find attached correspondence (without enclosures) dated September 1, 2010. The
original with enclosures will follow via certified mail.

The information in this facsimile transmission is legally privileged and confidential information intended only for the use of the individual or entity named above...

**2. Article Number**

7160 3901 9848 2376 3179

**3. Service Type** CERTIFIED MAIL

**4. Restricted Delivery?** *(Extra Fee)* ☐ Yes

**1. Article Addressed to:**

Geoffrey V. Pohl
Claims Examiner
Vela Insurance Services, Inc.
11516 Nicholas, Street, Suite 301
Omaha, NE 68154

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)

B. Date of Delivery
9-3-10

C. Signature
X

☐ Agent
☐ Addressee

D. Is delivery address different from item 1?
If YES, enter delivery address below:    ☐ Yes   ☐ No

CLG

rm 3811, July 2001          Domestic Return Receipt